IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

K.D, by her guardians,
RAYMOND DOTSON and
RACHELLE HAIRSTON

       Plaintiff,                    Civ. Action No. _____

v.

JERRY SWAFFORD, in his individual capacity;
THE PIKE COUNTY BOARD OF EDUCATION,
REED ADKINS, in his individual capacity; and
MARK GANNON, in his individual capacity.

       Defendants.

## COMPLAINT

### INTRODUCTION

1. For years, Pike County Board of Education employee Jerry Swafford hosted "parties" at his home, during which he plied children with drugs and alcohol and sexually abused them. The Board was aware of the parties and other misconduct by Swafford but did nothing, while untold numbers of Pike County children suffered as a result. This case is about just one of those children.

2. On Friday, October 14, 2016, a concerned parent called Belfry Principal Mark Gannon to report that her daughter had received an invitation to a party at Swafford's home *the next night*. She also informed Principal Gannon that she had seen photographs of Swafford in his home with underage girls wearing nothing but towels. Rather than taking action, however, Gannon criticized the parent for impugning Swafford's character. Later that day, the same concerned parent phoned the Pike County Board of Education and made the same report, but the Board also took no action.

3. While school officials were preoccupied with Homecoming activities, Swafford's "party" — attended by dozens of Pike County students and other children — went off as planned. And because of the Board's callous and deliberate indifference, K.D., a sixteen-year-old child, was drugged and raped by Swafford.

4. Swafford has pled guilty to his crime and will serve years in prison, but the damage to K.D. — damage that the Board could have and should have prevented — will last a lifetime. This suit seeks to hold the Board accountable for caring more about protecting a sexual predator than safeguarding a child.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over the Plaintiff's § 1983 and Title IX claims against the Board under 28 U.S.C. § 1331, and supplemental jurisdiction over her state law claims against Swafford under 28 U.S.C. § 1367.

6. The Court has personal jurisdiction over Mr. Swafford, who worked in this district, and over the Board, which is situated within the district.

7. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in Pike County, Kentucky.

## FACTS

8. During the relevant time period, Swafford was a Board employee. Specifically, Swafford was the plant supervisor at Belfry High School.

9. On or around the week of October 10, 2016, Swafford planned a joint birthday party for himself and a friend. It was Swafford's 61st birthday. The "friend" was B.H., a sixteen-

year-old student from another school district with whom Swafford was having a sexual relationship.

10. Invitations to Swafford's party circulated among Belfry High School students via social media. Swafford also personally invited children to attend his party while at school, and using the cellular telephone provided by the Board.

11. The party, at Swafford's home in Chattaroy, West Virginia, was attended by approximately 30 children. Swafford was the lone adult.

12. As host, Swafford provided the children with 40-ounce bottles of malt liquor, 16-ounce Rasberrita "tall boys," vodka, marijuana, synthetic marijuana, and a cake that said "Happy Birthday [B.H.]"

13. K.D., a sixteen-year-old Belfry High School student was one of the attendees.

14. Upon her arrival, Swafford handed K.D. a mixed drink. Shortly thereafter, K.D. became intoxicated.

15. Two witnesses observed Swafford spike K.D.'s drink with a prescription sleeping pill.

16. Hours later, another female child noticed K.D.'s absence and went looking for her. When she opened the door to Swafford's bedroom, she saw K.D. face down on the bed, apparently unconscious, with her pants and underwear around her ankles. Swafford was on top of her, pants down, with his penis touching K.D.'s genitals.

17. K.D. was taken to the hospital, where she received treatment for he injuries.

18. K.D. has also received psychiatric treatment for the mental anguish and emotional trauma inflicted as a result of Swafford's assault.

19. Swafford was interrogated by the West Virginia State Police and confessed to his assault on K.D. He was subsequently charged with one felony count of sexual abuse by a parent, guardian, or custodian, and one misdemeanor count of contributing to the delinquency of a minor.

20. In January 2017, Swafford appeared before the Mingo County Circuit Court and pled guilty to one felony count of sexual abuse of a minor. In open court, he admitted to the facts alleged in paragraph 16.

21. Prior to K.D.'s rape, the Board and Superintendent Adkins had long been aware that Swafford posed a substantial risk to students.

22. For example, in 2012, a co-worker discovered Swafford masturbating in his office with a female student's garment wrapped around his face. Although the co-worker reported this disturbing incident to the Belfry High School principal, no action was taken.

23. During approximately the same time period, a public post in an online community forum, of which the school administration was aware, warned that Swafford was "chasing little girls all over the school" and engaging in sexual conduct with girls as young as fifteen.

24. Swafford also frequently engaged in lecherous conduct on school grounds, including inappropriate sexual contact with female students and inappropriate sexual remarks. These public acts were witnessed by school officials and recorded by school surveillance cameras.

25. Swafford began hosting "parties" for students in or around 2015, when he was awarded custody of his teenage daughter. He actively recruited guests at school and school events. Parents, who were not made aware of previous allegations against Swafford, felt safe because of Swafford's position of trust within the school system.

26. In order to build relationships, Swafford frequently used school resources to access and disseminate confidential information to students he would later recruit.

27. Soon, bacchanalian weekend parties fueled by drugs and alcohol were an every-weekend occurrence at Swafford's home, and an open secret among the Belfry High School faculty and administration.

28. School officials were made aware of these parties by parents and students on numerous occasions, but took no action.

29. Most disturbingly, the Board had express forewarning about the party at which K.D. was raped, but did nothing to stop it.

30. On the afternoon of Friday, October 14, 2016, a concerned parent called Belfry High School Principal Mark Gannon to report that her daughter had received an invitation to Swafford's birthday party, which was to occur at Swafford's home on the very next day.

31. The parent told Principal Gannon that she was concerned for the safety of the children at the party because Swafford had provided drugs and alcohol to her daughters in the past, and because she had seen photographs of Swafford in his home, arms wrapped around two underage girls wearing nothing but towels. The parent begged Principal Gannon to stop the party.

32. Rather than taking any action, however, Principal Gannon admonished the parent for making allegations that could damage Swafford's reputation and career.

33. Principal Gannon later admitted that he did not even discuss the allegations with Swafford because he was too preoccupied with the weekend's Homecoming festivities.

34. After being ignored by Principal Gannon, the same concerned parent called the Board of Education and spoke directly to the office of Superintendent Adkins and the Board to

provide the same warning of imminent harm to K.D. Like Gannon, Superintendent Adkins and the Board deliberately chose to do nothing.

35. When word of the rape reached the school the following Monday, one teacher uttered in response: "we all knew something like this was going to happen."

36. Indeed, they did. For years, the Board knew Swafford was dangerous. Then, when the school system had the chance to protect K.D. and her classmates from a known, imminent threat, the Board chose to shield a predator instead. And for the callous indifference of the adults who were supposed to protect her, K.D. will pay a price for the rest of her life.

## COUNT I

**Violation of the Due Process Clause, Fourteenth Amendment (42 U.S.C. § 1983)**

**K.D. v. The Board, Superintendent Adkins (individual capacity), Principal Gannon (individual capacity), and Swafford (individual capacity)**

37. School children like K.D. have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment, and physical sexual abuse by a school employee violates this right. *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996).

38. Swafford used his position as a school employee to violate the constitutional rights of students.

39. The Board maintained an unconstitutional custom or practice of failing to act to prevent sexual abuse. *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005).

40. The facts show a clear and persistent pattern of prior misconduct involving similar acts as those committed by Swafford in violation of students' constitutional rights to be free of sexual harassment, sexual abuse, and sexual assault.

6

41. The Board had actual or constructive notice of this pattern of sexual misconduct by Swafford.

42. The Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act amounted to an official policy of inaction.

43. These facts show a pattern of constitutional violations that would have made it obvious to the Board that different policies, training, supervision, or disciplinary were needed to prevent school employees from sexually harassing, abusing, or assaulting students.

44. The Board's custom or toleration of this custom was the moving force or direct causal link in Swafford's wrongdoing. *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996).

45. Superintendent Adkins and Principal Gannon are personally liable under 42 U.S.C. § 1983 for depriving K.D. of her due process right as a public school student to personal security and bodily integrity because (a) they, as supervisors, learned of facts or a pattern of inappropriate sexual behavior by Swafford, a subordinate, pointing plainly toward the conclusion that Swafford would sexually abuse or assault K.D., a student; (b) they demonstrated deliberate indifference toward the constitutional rights of K.D. by failing to take adequate precautions that was obviously necessary to prevent or stop the abuse; and (c) such failure caused a constitutional injury to K.D.

46. Superintendent Adkins and Principal Gannon's conduct amounted to a tacit authorization of or knowing acquiescence in Swafford's sexual misconduct against students like K.D.

# COUNT II

**Violation of Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681-88)**

**K.D. v. The Board**

47. Title IX provides that "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This includes the duty not to discriminate on the basis of sex, which encompasses a school employee's sexual abuse of a student. *See Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 282 (1998) (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 74-75 (1992)). Title IX may be enforced through an implied right of action. *See id.* at 280-81.

48. The sexual abuse by Swafford that K.D. experienced was so severe, pervasive, and objectively offensive that it undermined and detracted from her educational experience and effectively denied her equal access to the educational opportunities and benefits offered in the Pike County schools.

49. As school officials with sufficient authority to respond, Superintendent Adkins and Principal Gannon each had actual notice that Swafford posed a substantial risk of harm to students, to which K.D. was subjected.

50. Superintendent and Principal Gannon were officials of the Board with sufficient authority to address the discrimination and to institute corrective measures, yet they failed to do so.

51. The Board was deliberately indifferent to that substantial risk.

52. The Board's response was clearly unreasonable in light of the known circumstances.

53. The Board's conduct excluded K.D., on the basis of sex, from participation in an educational program or activity that receives federal financial assistance.

54. The Board's conduct denied K.D. the benefits of an educational program or activity that receives federal financial assistance.

55. The Board's conduct subjected K.D. to discrimination under an educational program or activity that receives federal financial assistance.

56. The Board thus deprived K.D. of rights secured by Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.

57. As a result, K.D. suffered damages.

## COUNT III

**Violation of Ky. Rev. Stat. § 344.555 – Prohibition against sex discrimination under any education program receiving state financial assistance**

**K.D. v. The Board**

58. The sexual abuse by Swafford that K.D. experienced was so severe, pervasive, and objectively offensive that it undermined and detracted from her educational experience and effectively denied her equal access to the educational opportunities and benefits offered in the Pike County schools.

59. School officials with sufficient authority to respond had actual notice that Swafford posed a substantial risk of harm to students, to which K.D. was subjected.

60. Superintendent and Principal Gannon were officials of the Board with sufficient authority to address the discrimination and to institute corrective measures.

61. The Board was deliberately indifferent to that substantial risk.

62. The Board's response was clearly unreasonable in light of the known circumstances.

63. The Board's conduct excluded K.D., on the basis of sex, from participation in an educational program or activity that receives state financial assistance.

64. The Board's conduct denied K.D. the benefits of an educational program or activity that receives state financial assistance.

65. The Board's conduct subjected K.D. to discrimination under an educational program or activity that receives state financial assistance.

66. The Board thus deprived K.D. of rights secured by the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.555.

67. As a result, K.D. suffered damages.

## COUNT IV

### Negligence Per Se

### K.D. v. Superintendent Adkins (individual capacity) and Principal Gannon (individual capacity)

68. "The doctrine of negligence per se allows a court to determine a standard of conduct by reference to a statute." *Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 817 (E.D. Ky. 2014) (applying Kentucky law). In short, "[n]egligence per se is merely a negligence claim with a statutory standard of care substituted for the common law standard of care." *Young v. Carran*, 289 S.W.3d 586, 588-89 (Ky. Ct. App. 2009).

69. "Kentucky has codified the common law negligence per se doctrine and created an avenue by which an individual may seek relief even where a statute does not specifically provide a private remedy. KRS § 446.070 provides that '[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation.'" *Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 817 (E.D. Ky. 2014).

70. Kentucky Revised Statutes § 620.030 establishes a standard of care that requires an individual to make a report to law enforcement authorities whenever that individual knows or has reasonable cause to believe that a child is harmed or threatened with harm.

71. The Kentucky Supreme Court has stated the language of Kentucky's mandatory reporting statute is "clear and unambiguous" such that "[a]ll individuals with firsthand knowledge or reasonable cause to believe that a child is abused have a mandatory duty to report the abuse." *Commonwealth v. Allen*, 980 S.W.2d 278, 281 (Ky. 1998). Supervisors who receive reports from their subordinates must relay that information to the authorities. *Id.* A superintendent and school principal squarely fall within the meaning of the statute's reference to "supervisors." *Id.*

72. Because the reporting requirement in § 620.030 is mandatory, Kentucky courts have held that the act of reporting child abuse is a ministerial—rather than discretionary—act for which public school officials can be held liable in the event that they perform the act negligently. *See Savage v. Carter Cty. Bd. of Educ.*, 2009 WL 1884137, at *11 (E.D. Ky. June 30, 2009) (citing *Nelson v. Turner*, 256 S.W.3d 37, 43 (Ky. Ct. App. 2008)).

73. Superintendent Adkins and Principal Gannon knew or had reasonable cause to believe that K.D. would be harmed by Swafford.

74. Superintendent and Principal Gannon negligently performed their mandatory duty under § 620.030.

75. As a result of Superintendent and Principal Gannon's negligence per se, K.D. suffered damages.

# COUNT V

## Negligence

### K.D. v. Superintendent Adkins (individual capacity) and Principal Gannon (individual capacity)

76. Under Kentucky law, the "special relationship . . . formed between a school district and its students imposes an affirmative duty on the district, its faculty, and its administrators to take all reasonable steps to prevent foreseeable harm to its students." *Williams v. Kentucky Dep't of Educ.,* 113 S.W.3d 145, 148 (Ky. 2003).

77. Superintendent Adkins and Principal Gannon owed K.D. a duty of care in the retention and supervision of Swafford and for the safety of all students.

78. Superintendent Adkins and Principal Gannon owed a duty to notify K.D., her parents, and the parents of all students of the substantial risk of harm posed by Swafford.

79. Superintendent Adkins and Principal Gannon had a duty to warn K.D., her parents, and all students and parents if a school employee under their control and supervision posed an unreasonable risk of harm.

80. Superintendent Adkins and Principal Gannon knew or reasonably should have known that Swafford was unfit for the job and that his placement or retention in that job created an unreasonable risk of harm to students.

81. Superintendent Adkins and Principal Gannon failed to exercise reasonable care for the safety of students.

82. Superintendent Adkins and Principal Gannon negligently retained and supervised Swafford as a janitor at Belfry County High School.

83. Superintendent Adkins and Principal Gannon failed to notify K.D., her parents, and the parents of all students that Swafford posed a substantial risk of harm.

84. Superintendent Adkins and Principal Gannon negligently failed to warn K.D., her parents, and all other students and parents, that Swafford posed an unreasonable risk of harm to students.

85. As a result of Superintendent Adkins and Principal Gannon's negligence, K.D. suffered damages.

## COUNT VI

### Civil Battery

### K.D. v. Swafford (individual capacity)

86. "A sexual assault . . . is a battery," *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 727 (Ky. 2009), and "[b]attery is an intentional tort," *Vitale v. Henchey*, 24 S.W.3d 651, 656 (Ky. 2000).

87. Under Kentucky law, common law civil battery is defined as "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (quoting *Sigler v. Ralph*, 417 S.W.2d 239, 241 (Ky. 1967))

88. Swafford acted intentionally to cause a harmful or offensive contact to K.D.

89. Swafford intentionally and unlawfully touched K.D.

90. As a result of Swafford's intentional and unlawful touching, K.D. suffered damages.

**WHEREFORE**, the Plaintiff respectfully requests the following relief:

1. Trial by jury on all issues so triable;

2. Judgment against defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus court costs, expenses, and attorney's fees in this action;

3. Prejudgment and post judgment interest at the maximum allowable rates at law;

4. Punitive damages against the individual defendants in their individual capacities; and

5. Any other relief to which Plaintiff may seek or be entitled under law or equity.

        Plaintiff,
        By Counsel,

*/s/ Michael B. Hissam*
Michael B. Hissam (KY Bar No. 97147)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
mhissam@baileyglasser.com