

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

K.D.,

Plaintiff,

v. Civil Action No. 7:17-cv-132-KKC

JERRY SWAFFORD, in his individual capacity;
THE PIKE COUNTY BOARD OF EDUCATION,
REED ADKINS, in his individual capacity; and
MARK GANNON, in his individual capacity.

Defendants.

The deposition of PHILLIP HAYWOOD, taken upon oral examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure, before Kimberly Wooten, Court Reporter and Notary Public in and for the State of Kentucky, Wednesday, May 17, 2018, at the Pike County Board of Education, 316 Mayo Trail, Pikeville, Kentucky.

REALTIME REPORTERS
713 Lee Street
Charleston, WV 25301
(304)344-8463
www.realtimereporters.net

APPEARANCES

On behalf of K.D.:

    Ryan McCune Donovan, Esquire
    William Flynn, Legal Assistant
    Bailey & Glasser, LLP
    209 Capitol Street
    Charleston, WV   25301
    (304) 345-6555
    rdonovan@baileyglasser.com

On behalf of Mark Gannon and Reed Adkins:

    Jonathan C. Shaw, Esquire
    Porter, Banks, Baldwin & Shaw, PLLC
    327 Main Street
    Paintsville, KY   41240
    606) 789-3747
    jshaw@psbb-law.com

On behalf of the Pike County Board of Education:

    Neal Smith, Esquire
     General Counsel, Pike County Board of Education
    316 South Mayo Trail
    Pikeville, KY   41501
    (606) 433-9208
    neal.smith@pike.kyschools.us

    Michael A. Owsley, Esquire
    English, Lucas, Priest & Owsley, LLP
    1101 College Street
    Bowling Green, KY   42102
    (270) 781-6500
    mowsley@elpolaw.com

On behalf of Jerry Swafford:

    Mark K. Thompson, Esquire
    Smith Thompson & Kennedy, PLLC
    140 Scott Avenue
    Pikeville, KY   41501
    (606) 432-2156
    maxthompson@setel.com

EXAMINATION INDEX

PHILLIP HAYWOOD

Examination by Mr. Donovan                    Page  4

Examination by Mr. Shaw                       Page 32

EXHIBIT INDEX

No. 1  Haywood Letter, Pike 470               Page 24

P R O C E E D I N G S

PHILLIP HAYWOOD

was called as a witness by the Plaintiff, pursuant to notice, and having first been duly sworn, testified as follows:

EXAMINATION

BY MR. DONOVAN:

Q. Thank you very much, Coach Haywood, for being here today. I grew up in Williamson, so I've heard a lot about you, but I've never had the pleasure of meeting you before. So I appreciate you being here today and appreciate you giving us your time today.

A. Well, thank you.

Q. A lot of people in Mingo County have always said they wanted to play Belfry in football, and I've always advised them that would probably not be a very good idea to have.

Mr. Haywood, could you spell your name on the record for the court reporter, if you haven't already.

A. All right. Phillip, P-H-I-L-L-I-P, H-A-Y-W-O-O-D.

Q. Thank you. And not to be reflected on the record, Mr. Haywood, what is your physical address?

A. [redacted], Forest Hills, Kentucky.

Q. And also not to be reflected on the record, could you give us your date of birth and Social Security number.

A. [redacted]

Q. Thank you. Mr. Haywood, have you ever given a deposition before?

A. Yes.

Q. Okay. When did you do that?

A. Well, the first one was back in 1976. I don't know if you want them all or not, but really I haven't done many.

Q. Okay.

A. But I had one, I had a player that was very seriously injured, and there was a suit with a helmet company and so I had to do that one, yes.

Q. Sure. And you're correct, I don't need you to tell me about every one of them.

A. Okay.

Q. Fair to say, you've given a handful of depositions over the years?

A. Yeah, two or three. Yeah, not many.

Q. All right. Were you ever a party in any of those cases?

A. In?

Q. In any of the cases in which you gave a deposition?

A. One time there was a traffic accident, not major or anything, but I was part of the accident so I was deposed in the settlement, yeah.

Q. Sure. Were you either suing or being sued in that case?

A. I was being sued, or the insurance company was, yeah.

Q. Okay. Have you been involved in any other litigation as a party?

A. I don't know, that may be all -- there may be one slipping my mind, but, you know, I haven't been in any kind of litigation, you know. Maybe another deposition.

Q. I'm just interested, best you can recall, so that's fine.

A. Okay.

Q. I don't think anybody asked you to put together any documents or anything like that today.

A. Right.

Q. So just to give you some background on deposition -- and I truly don't believe this will take very long at all -- but going to ask you some questions.

I am going to ask you some questions, the other lawyers may, too. You understand you are under oath today?

A. Yes.

Q. You understand that means you need to answer truthfully today, as I'm sure you would anytime, as I'm sure you would do if we were in front of a judge and a jury in a courtroom?

A. Yes.

Q. Okay. There may be times today, maybe not, when one of the lawyers will state an objection in response to one of my questions. If that happens, you will probably need to answer the question anyway to preserve the testimony for a later date.

Do you have an attorney with you here today?

A. No. I mean, not a personal attorney, the Board attorney.

Q. Is it your understanding that Mr. Smith is your attorney in any capacity today?

A. I don't -- well, not -- I don't think so.

MR. SMITH: Not in this case.

A. Not in this case, no.

Q. Okay. That's all I needed to know. I just, I'm asking that so to make sure not to run afoul of any of our rules.

A. Okay.

Q. The only other thing is, and you're doing fine on this, you need to give verbal or "yes" or "no" answers to the questions so the court reporter can get those down, as opposed to shaking your head or saying "uh-huh."

A. Okay.

Q. And to the best of your ability, sometimes it's hard when we engage in a normal conversation, we go fast and we tend to talk at the same time, but today I'll try to let you finish your answers before I begin with another question, and you try to do the same thing for me.

A. Yes.

Q. Last thing -- again, I don't think we'll need this because I think it's going to be very short today -- but if you need a break at any time, just say so. The only condition I would impose is, that if you're in the middle -- if I've asked you a question, I would like you to finish answering the question before we take a break.

A. Okay.

Q. All right. Do you prefer Coach Haywood or Mr. Haywood?

A. Oh, just either one. I've been called a lot of things in my time, so.

Q. Okay. Well, Coach Haywood, can you tell me how long you've been employed at Belfry High School?

A. 34 years. 34, 35, I've lost track, but it's in that vicinity.

Q. And have you ever been employed at any school other than Belfry High School?

A. Yes. I was employed at Meade County High School.

Q. What county?

A. Meade County. And Prestonsburg High School.

Q. But that was more than 35 years ago or more?

A. Yes.

Q. What are your -- I want to say, usually I ask people what their title is -- but I want to ask you what your current titles are?

A. Well, I'm head football coach at Belfry. I'm listed officially, I think, as part-time athletic director, part-time guidance counselor.

Q. Okay. Fair to say, those are both -- you're officially part-time, but those are both kind of full-time jobs that you're doing at the same time?

A. Yes.

Q. Okay. How long have you been the head football coach?

A. 34, 35 years.

Q. You were never an assistant at Belfry?

A. No.

Q. Okay. And how long have you been part-time athletic director?

A. Well, I was athletic director for, since '99 up through probably 2015 maybe, then I've been kind of part-time maybe the last three years.

Q. How long have you been guidance counselor?

A. Since 1985.

Q. Okay. Where you ever a classroom teacher at Belfry?

A. No.

Q. Okay. So prior to '85, you were a coach only?

A. No, I was a teacher and a coach.

Q. Okay. What did you teach?

A. Well, I taught different things. I taught -- at Meade County, I was in middle school, so I taught a little bit of everything, but mainly math and science. At Prestonsburg, I taught health and PE. And then I taught in the middle school there, and at that middle school you taught every subject, so all of them.

Q. Okay. And I appreciate you giving us your time today, so I'm not going to go through the whole song and dance on your background. I think we can, if there is anything we'll need, we can get it from Mr. Smith.

MR. SMITH: Yes.

Q. So I'll just, right into the -- what do you consider your job to be as the head football coach?

A. My job?

Q. Mm-hmm.

A. Well, it's to produce a good program. But my main emphasis, and always has been for me, is to help young people to grow as individuals from wherever they are when they enter our program to where they leave to help them enter into adulthood.

Q. Do you have, in order to meet that goal, do you have certain expectations of your players?

A. Certainly.

Q. Okay. What kind of expectations do you have for them?

A. Well, we expect them to work hard, we expect practice, you know. Have good manners and respect, you know, those type of things.

Q. Sure. Do you have expectations for their

personal conduct?

A. We do.

Q. Okay. What do you expect from them along those lines?

A. Well, you know, we just, we tell them to act like a player should, and do the right thing, you know, treat your teammates the way they should be treated. And there is a third one in there, but treat others the way you would like to be treated. And that's kind of our three goals. They cover a lot of territory.

Q. They do. Do you tell them that they're representatives of the program and the school when they're outside of the school?

A. Oh, yes.

Q. Okay. And what are your expectations for them as representatives for the school when they're outside of the school?

A. Well, we expect them to conduct themselves in a manner that wouldn't draw a bad reflection, you know, on our program or on the school.

Q. Okay. Are there, in 34 years, can you think of some examples of things that players have done that you would consider as not reflecting well on --

A. Well, sure, I can go back 45 years, you know,

things -- things are going to happen. I mean, kids are going to be kids, and, you know, they'll do a little something at the prom, or, you know, just what I would call young kids being kids. And they might be influenced by the wrong person, or just get a little bit out of line, and then when it happens, we deal with it.

Q. Can you give me some examples of things that have occurred outside of the football program before that you considered running afoul of your duty as representatives of the school?

A. Yeah, I had a young guy, it's been several years ago, but I think he got DUI at the prom one night. You know, I don't know if it was over here in Pikeville or in Belfry, and, you know, once it becomes public knowledge, that's something that I've -- I tell the parents, I say, "Hey, you know, this kind of fell in my lap, I didn't go looking for it."

And so that, that would be one example, you know. And so and then what we do, we got a policy that we kind of by and say, all right, here's what you can do to, you know, this, this and this, the procedures that you can go through, all of that.

Q. Is that a team policy?

A. That's a school policy.

Q. School policy?

A. Mm-hmm.

Q. Is that a written policy?

A. Yes.

Q. Okay. Where is that policy published; do you know?

A. Yeah, we got it at school.

Q. And that is a policy for how you would treat conduct by athletes, is that the policy you're describing?

A. Yes. Yeah, I mean, we've got what is called an alcohol and drug policy -- alcohol, tobacco and drug policy, which became fairly prevalent back there I guess in the early '90s, and a lot of people starting having those, and we did.

And since then, we've adopted that same policy within our -- I guess our athletic program code of conduct, we call it, and that's inclusive in that, you know, there is some general guidelines in there about what we expect out of athletes.

Q. How do you enforce these guidelines on your players?

A. How do I enforce them?

Q. You have rules, right? So there has to be

some way to enforce those rules, right?

A. Yeah. Well, for instance the young man that we were talking about, the guidelines in our policy says for alcohol or drug violation, you're suspended for five games, unless you agree to attend some training -- there's a name for that -- you know, we set that up, usually at our school and a cop or somebody will come in. And the parents almost -- and the kid, they're going to agree to go to the training, because then that reduces that to 20 percent for a first-time offense. And then we've got things listed for second-time offense and third-time offense.

And to be perfectly honest with you, I think -- I don't know if we've really had any second-time offenders that stayed on our team. You know, one time usually get the message across. But we don't have many, I mean, really. I mean, there might be things happen, but -- you know, that I'm not be privy to -- I know kids are going to be kids, but that's one, that's one example.

Q. So in the past, you know, you've booted second time offenders off the team?

A. Second and third maybe, you know, we've -- I'll go a long way with a kid before I have to let him

go, but I've done that, yes.

Q. Okay. Do you need approval from anyone to remove a kid from the football team?

A. No, I usually -- now, I say no, I have that authority, but I've got to have good grounds for it. But I always will usually run it by, you know, a higher person, principal or somebody. I'll say, "Hey, here's what I'm about to do, I just want you to know this was okay, what do you think about it, and here is why."

Q. Do you ever impose lesser penalties on players on your team, like, "Hey, I heard you got in a little bit of trouble, so you're going to sit out for the first quarter of this game;" something like that?

A. Sure.

Q. Okay. And are those penalties, just like the other ones, that's your discretion as a coach; is that correct?

A. Yeah, for, you know, these would be things, say kids not acting right in class. And then I talk with him once, so the principal talks with him the second time, I talk with him a third time. After five or six times, say, I've got to get your attention. So I'll say here's what we're going to do, you're going to sit out the first quarter, you're going to sit out the

first half. And usually that helps tremendously.

Q. Several witnesses who I've spoken to recall that in 2015 and 2016 there were some football players who were punished on the team for drinking alcohol. And Mr. Gannon yesterday testified that he thought that was possible, and he wouldn't necessarily have known because that's what -- that's something you would handle. Do you recall punishing any players in 2015 or 2016?

A. Yeah, it's '15-'16, '16-'17, I had a couple right at the beginning of the year made a little episode at the Pike County Bowl -- not our bowl game, but after we played, I think it was the next night or something, or the prior night -- yeah, we play on Friday nights, so it would have been Saturday night.

And word kind of got back to me about it, that, hey, couple of your guys have, might have had some alcohol over at the ball game. And so basically I just questioned them and said, "Is that true?" Well, one of them said, "Yeah, Coach," it was.

And I said, well, you know, I don't have much of a choice in this matter because of what we've talked about, you know, because of the conduct we want our players to do. So, yeah, they sit out a couple of games.

Q. And did you report that, those incidents to anyone else?

A. I'm sure our principal was aware of it, you know, whether he remembers the exact details. But I'm, you know, the parents are very much aware of it because I was sure to talk with them about it, you know.

Q. Sure.

A. But it's not -- let me say this: As far as making, anytime I have to hold a kid out of the game or kid is on our sidelines in a jersey, you know, we don't specify, put it out in the newspaper that we're holding this kid out because he did this, because the kid's got some privacy.

Q. Sure.

A. So that kid could be staying on the sideline because he's got a knee injury, he could be staying on the sideline because his grades were low that week, he could be standing on the sidelines because he's had some difficulty with a teacher; there could be a myriad of reasons why he might be standing on the sidelines, so that's not something we make a whole lot of public knowledge about because of kids' privacy issues.

Q. Sure. And I appreciate your respect for student privacy. I'll tell you that we have a standing

agreement in this case that we will redact the names of minors to protect their privacy.

A. Yeah.

Q. So with that in mind, do you recall the names of the students who were punished in the incidents you described?

A. Yeah, it was --

MR. SMITH: Objection. I'm sorry, I don't --

MR. SHAW: No.

MR. SMITH: I don't think we can divulge that information.

MR. DONOVAN: It's not attorney-client privilege.

MR. SMITH: I'm not talking about attorney-client privilege, I'm talking about FERPA. That's illegal.

MR. SHAW: We'll be glad to give the parents, we'll be glad to put the parents on notice that you want their information and give them the opportunity to object, but you cannot divulge records on students.

MR. SMITH: Absolutely not.

MR. DONOVAN: Subject to a protective order that we've got that's signed by a United States District Court judge?

MR. SHAW: I don't think that other students necessarily will be covered under that protective order.

MR. DONOVAN: There have been numerous incidents in this case where if that were true that objection should have been lodged and it wasn't.

MR. SMITH: Well, it's been lodged now.

MR. DONOVAN: It certainly wasn't lodged --

MR. SHAW: With a child's discipline records at school?

MR. DONOVAN: I'm not asking about the child's disciplinary --

MR. SMITH: Yes, you are. You're asking about a child that was disciplined by the football coach. No, that's not discoverable, I'm sorry, I -- and if you want to file a motion or -- I mean, I don't care if you get it obviously, I don't know who the children are and I don't represent them, but I can't allow our football coach to divulge that information. It's a clear violation of FERPA, clearly, and I can't -- I can't sign an agreed order, nor can anybody else here, I don't think.

MR. SHAW: Waiving another student's rights to privacy.

MR. SMITH: I mean, it's not a client of mine.

MR. SHAW: I would say that, I think we can try to work with you on it, but as it sits today, I don't know that we can identify those students.

MR. SMITH: Yeah, I don't mind a bit giving you the information if we do it the appropriate way.

MR. DONOVAN: So let me just put on the record, you, Neal Smith, you, Jon Shaw -- anybody else want in on this?

MR. THOMPSON: No.

MR. OWSLEY: Neal speaks for the Board.

MR. DONOVAN: All right. Instructing the witness not to answer a question at a properly noticed deposition, and you're not asserting the attorney-client privilege?

MR. SMITH: I am -- I am saying that it would be inappropriate and illegal for Coach Haywood to divulge the names of students that he has disciplined at Belfry High School without some notification to the student. Now, those students may be 18 years old now, and if they are, we can talk to them, and/or the parents, if they're still minors. Absent that, he can't do that.

MR. DONOVAN: Okay. I just want this on the record for the motion.

MR. SMITH: Sure.

MR. DONOVAN: Are you, Neal Smith, and you, Jonathan Shaw, instructing the witness not to answer a question at a properly designated deposition and I understand that you're not asserting that the information is covered by the attorney-client privilege; is that correct?

MR. SHAW: I'll raise the objection. But I am not acting on behalf of the Board, so I can't instruct him not to answer it. But I agree with Mr. Smith's recitation of what the applicable federal law is.

MR. DONOVAN: Well, no one represents him today.

MR. SMITH: I would --

MR. SHAW: Yes, he does, he's represented by his employer.

MR. DONOVAN: I asked that question at the outset of this deposition.

MR. SHAW: His employer cannot allow him to violate -- okay, well.

MR. SMITH: Well, Ryan, I'm happy to work this out with you, I mean, and I'm sure we can figure out a way to get that information, if that's what you want. But you can't just solicit it from Coach Haywood just

out of the blue without some release from the students and/or the parents. I don't know who the kids are, don't know how old they are.

MR. DONOVAN: Okay. Well, I understand that's your position. We'll move on.

MR. SMITH: Okay.

MR. OWSLEY: Just for the record, that the law that Mr. Smith and Mr. Shaw are referring to, the Family Educational Rights and Privacy Act, commonly referred to as FERPA, which provides that a school district cannot release the names of students' education records, which include discipline records, without procedures to be followed under that statute which have not been followed here. I just recite that to the record so that it's clear why it's being raised. And I understand your position, Ryan.

BY MR. DONOVAN:

Q. Okay. Sorry for that digression. I'm sure you love sitting around --

A. That's all right.

Q. -- listening to attorneys yell.

I just want to, I may have asked this in a different form, I just want to be clear: Without asking about the student names, did you report those

punishments to Principal Gannon?

A. Yeah, I feel certain that I ran by him, you know. Because usually when I do something, I kind of let the principal know. I'm not going to sit here and say for certain I did, but it, it was one of those things that probably within our school or hierarchy probably knew had taken place, you know.

Q. Did you report that, your knowledge of those incidents, to any other entity?

A. I don't think so.

Q. Okay. I want to have this exhibit marked Exhibit 1, and have you take a quick look at it.

(Exhibit No. 1 marked for identification.)

A. Okay.

Q. Do you recognize that?

A. Yes, it's a recommendation letter that I wrote for Mr. Gannon.

Q. I don't see a date on that letter; do you recall when you wrote it?

A. Supposed to date those, aren't you? I'm sure it was when he was applying to become principal of Belfry High School. And I don't know how long he's been principal, about four or five years, something like that, so probably the spring prior to that, something to

that nature.

Q. All right. Did Mr. Gannon ask you to write that letter for him?

A. You know, I don't know if he asked me to write that letter, I can't recall.

Q. Do you write a lot of letters of recommendation?

A. I write a ton of them.

Q. I bet you're -- I imagine as long as you've been there, your opinion carries a lot of weight around that school?

A. Well, I don't know if it carries any weight, but I write a lot of letters, especially for kids, you know, and people call in, and so.

Q. How long have you written letters of recommendation for someone for an administrative job like that one?

A. Oh, a few times. Yeah, quite a few.

Q. Who was the principal before Mark Gannon?

A. Rod Varney.

Q. Do you recall if you recommended Rod Varney for that position?

A. I don't know. If I was asked, I certainly would have. And sometimes, you know, I -- but I can't

remember.

Q. And who was the principal before Rod Varney?

A. Frank Welch.

Q. Did you recall if you recommended Frank Welch --

A. I did not, because he hired me, so.

Q. That was my next question, I was going to ask you to stop me when I get to your hiring.

A. Yeah.

Q. So how long was Mr. Welch the principal?

A. Oh, he was at Belfry for 40 years.

Q. Okay. Why were you comfortable offering your recommendation of Mr. Gannon?

A. Well, I just observed his work habits, his work ethics, you know, just the way he went about things. He was organized, he was detailed, he had a good grasp of the educational system, and I felt like it would be worthwhile to offer a recommendation for him.

Q. Did you recommend any other candidates --

A. I may have.

Q. -- applying for the same job?

A. I may have, I don't know, I can't -- I can't remember. I don't know if we had anybody else apply, to be honest with you. But if someone had asked me that,

that I felt confident in their leadership, I wouldn't have said, well, I've already written one for one and not be able to do it for another if I felt that they had pretty good skills, you know.

Q. Are you --

A. But -- sorry.

Q. Are you personal friends with Mark Gannon, would you say?

A. Well, you know, I think we, we work well together, it's not -- I don't know if we go to dinners or anything like that, but, you know, I think we've got a good mutual respect for each other, get along well.

Q. Do you recall ever interacting with Mr. Gannon outside of school?

A. You know, not a whole lot. I mean, to be honest, I don't think so. Most of it is school-related, or, you know, occasionally we'll get in a vehicle together and drive over here, something like that, you know.

Q. Did you know Jerry Swafford?

A. I did.

Q. Okay. When did you first get to know Jerry Swafford?

A. When our school opened, he was the

construction site manager or something like that. I'm not sure exactly what his title was, but he was the guy that was overseeing the construction, so that's where I first met him.

Q. Okay. Did you work with Mr. Swafford at all over the past as head football coach?

A. Yes, I would say so.

Q. In what ways?

A. Well, I mean, he was like the overall maintenance guy at our school, so if you needed something or something tore up, he was the guy you went to. So if our air conditioner went down, I would say, "Hey, Jerry, we got an air conditioner problem, call somebody or fix it, one of the two;" or I would tell my one of my coaches, say, you know, "Holler at this guy, Jerry." So that was our capacity.

Q. Was Swafford somebody who was generally readily available to help you as you needed him?

A. Yeah. Yeah, pretty much.

Q. Did you -- did he put in a lot of time on the weekends, as far as you're aware?

A. Yes, he did. Yeah, he came early and stayed late, and seemed like if there was an activity there and someone needed him to be there, he was.

Q. Kind of employee willing to work after hours?
A. Mm-hmm.
Q. Okay. Did you ever, did you have Jerry Swafford's phone number?
A. I don't know if I did or not, I may -- maybe the last year or two I got it, but I think couple of -- usually I would have to get it from somebody, you know, I think one of the other coaches, and say, "Hey, I have to get ahold of Jerry, something is torn up, we got to get him;" or they would call him for me.
Q. So if you needed him for something after hours, a football game or something, you would have somebody call him up?
A. Yeah, as a general rule, I would say, "Hey, I need Jerry's number;" and I would send him a text or something like that, you know.
Q. And he generally responded pretty quickly?
A. Well, general rule, yeah.
Q. Okay. Do you work with the Boosters Club at all as head football coach?
A. With the Boosters Club, yes.
Q. Okay. Don't worry, I'm not -- I'm not asking about any recruiting or anything.
A. Yeah, okay. Yeah, we don't recruit.

Q. Oh, boy, I -- sorry.

Are you aware that Jerry Swafford sometimes worked with the Boosters Club?

A. In what capacity?

Q. Well, I'm asking you if you are aware of him working with the Boosters Club in any capacity?

A. No, not really. I mean, the people, you know, unless they ask him to do something, you know.

Q. Are you aware of the fact that the Boosters Club actually paid for Jerry Swafford's cell phone and cell phone bill?

A. Did not know that.

Q. Okay. And are you aware of what Mr. Swafford is accused of having done in this case?

A. Yes.

Q. Okay. And what is your understanding of that?

A. As to what?

Q. To what Mr. Swafford is accused of having done in this case?

A. Apparently being in bed with a young lady, or having a party on his property or something like that, yeah.

Q. Okay. Are you aware that Mr. Swafford has pled guilty to a felony related to that incident?

A. I'm not sure if I was aware of that or not, to be honest with you.

Q. You're aware that Mr. Swafford is currently incarcerated?

A. Yes.

Q. And it sounds like you have some awareness of the party that took place at Mr. Swafford's house?

A. Yeah, there has been some talk about that.

Q. Okay. Did you ever learn whether any of your football players attended that party?

A. No.

Q. Did you ever inquire?

A. No.

Q. Okay. Why didn't you ask?

A. There wasn't any reason to.

Q. Okay. So in terms of if there had been any discipline to be handed out for that, you would have thought it was appropriate to just wait until you found out about it from someone else?

A. Well, yes, I'm not -- I don't go searching to, to put kids under a gun, you know. If things, things that -- if there is a problem, it will eventually get to back to me.

Q. Right.

A. And it's usually over a period of time, it's not something that happens overnight.

Q. Sure. During that period of time -- I know you got a lot, go through a lot of kids on that team -- do you recall a player, having a player on your team named Dante(ph)?

A. Dante. Dante who?

Q. I have a hard time pronouncing that last name, Valderama(ph), I believe it is?

A. No.

Q. Okay. I thank you for your time today, Coach Haywood. I don't have any other questions for you.

I'll pass the witness.

EXAMINATION

BY MR. SHAW:

Q. Just got a couple quick questions.

Before the incident that occurred at Jerry Swafford's house in October of 2016, had you heard anything about parties at Swafford's house on the weekends, or that he was buying alcohol or drugs for kids or anything of that nature?

A. No.

Q. All right. And I believe you testified a few minutes, and I just want to make sure: You were asked,

and you didn't identify them, about some students who had some alcohol issues and what you did as a result of that. And I believe you said that you made the parents aware of the situation?

A. Oh, yes.

Q. Okay. All right.

A. Yeah.

Q. And you mentioned training, but instead of training, would it be more accurate to say that they went through some type of alcohol counseling sessions at Mountain Comprehensive Care?

A. Yeah. Yeah, we've got a Mountain Comp person that comes to our school.

Q. Okay.

A. So basically they had to go through so many sessions until that person approves, said, "Hey, I think they're good to go."

Q. Okay.

A. That's what they go to, yeah.

Q. All right. No further questions. Thank you.

MR. THOMPSON: No questions for me.

MR. SMITH: No.

(Deposition concluded at 4:44 p.m.)

CERTIFICATE OF COURT REPORTER:


I, Kimberly Wooten, a Notary Public and Professional Reporter within the State of Kentucky, duly commissioned and qualified, do hereby certify that the foregoing deposition was duly taken by me, the said witness having been by me first duly sworn.

I do further certify that said proceedings were correctly taken by me in stenotype notes, that the same were accurately transcribed out in full and true record of the testimony given by said witness to the best of my ability.

I further certify that I am neither counsel for, nor related to or employed by, any of the parties hereto or financially interested in the action.


Given under my hand this 28th day of May, 2018.




*Kimberly Wooten*
Kimberly Wooten
Professional Reporter/Notary Public

My commission expires: July 20, 2020

**Exhibits**

**Exhibit 1** 3:0 24:12,13

**1**

**1** 24:12,13
**1/31/51** 5:4
**15-'16** 17:9
**16-'17** 17:9
**18** 21:19
**1976** 5:9
**1985** 10:12

**2**

**20** 15:10
**2015** 10:9 17:3,8
**2016** 17:3,8 32:18

**3**

**34** 9:5 10:3 12:21
**35** 9:5,13 10:3

**4**

**40** 26:11
**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** 5:4
**45** 12:24
**4:44** 33:23

**5**

**512** 4:24

**8**

**85** 10:16

**9**

**90s** 14:14
**99** 10:8

**A**

**ability** 8:8
**Absent** 21:21
**Absolutely** 19:21
**accident** 6:3,4
**accurate** 33:9
**accused** 30:14,18
**act** 12:5 23:9
**acting** 16:19 22:9
**activity** 28:23
**address** 4:23
**administrative** 25:16
**adopted** 14:16
**adulthood** 11:15
**advised** 4:16
**afoul** 7:23 13:9
**agree** 15:5,9 22:10
**agreed** 20:20
**agreement** 19:1
**ahold** 29:9
**air** 28:12,13
**alcohol** 14:12 15:4 17:4,17 32:20 33:2,10
**Allison** 4:24
**and/or** 21:20 23:2
**answering** 8:20
**answers** 8:4,11
**anytime** 7:5 18:9
**Apparently** 30:20
**applicable** 22:11
**apply** 26:23
**applying** 24:21 26:21
**approval** 16:2
**approves** 33:16
**asserting** 21:13 22:5
**assistant** 10:4
**athletes** 14:9,20
**athletic** 9:19 10:7,8 14:17
**attend** 15:5
**attended** 31:10
**attention** 16:22
**attorney** 7:14,15,16,18
**attorney-** 19:14
**attorney-client** 19:12 21:13 22:6
**attorneys** 23:21
**authority** 16:5
**aware** 18:3,5 28:21 30:2,5,9,13,23 31:1,3 33:4
**awareness** 31:6

**B**

**back** 5:9 12:24 14:13 17:15 31:23
**background** 6:22 11:3
**bad** 12:19
**ball** 17:17
**basically** 17:17 33:15
**bed** 30:20
**begin** 8:11
**beginning** 17:10
**behalf** 22:9
**Belfry** 4:15 9:4,8,18 10:4,14 13:14 21:18 24:22 26:11
**bet** 25:9
**bill** 30:11
**birth** 5:2
**bit** 10:21 13:5 16:12 21:4
**blue** 23:1
**Board** 7:16 21:10 22:9
**Boosters** 29:19,21 30:3,6,9
**booted** 15:21
**bowl** 17:11
**boy** 30:1
**break** 8:17,21
**buying** 32:20

**C**

**call** 13:4 14:18 25:14 28:13 29:10,13
**called** 4:3 9:1 14:11
**candidates** 26:19
**capacity** 7:18 28:16 30:4,6
**care** 20:15 33:11
**carries** 25:10,12
**case** 6:7 7:20,21 19:1 20:4 30:14,19
**cases** 5:23 6:1
**cell** 30:10,11
**child** 20:13
**child's** 20:8,10
**children** 20:16
**choice** 17:21
**class** 16:19
**classroom** 10:13
**clear** 20:18 23:15,23
**client** 19:15 20:24
**Club** 29:19,21 30:3,6,10
**coach** 4:8 8:23 9:3,18 10:2,16,17 11:8 16:16 17:19 20:13,18 21:16 22:24 28:6 29:20 32:11
**coaches** 28:15 29:8
**code** 14:17
**comfortable** 26:12
**commonly** 23:9
**Comp** 33:12
**company** 5:15 6:8
**Comprehensive** 33:11
**concluded** 33:23
**condition** 8:18
**conditioner** 28:12,13
**conduct** 12:1,18 14:9,18 17:22
**confident** 27:1

**considered** 13:9
**construction** 28:1,3
**conversation** 8:9
**cop** 15:7
**correct** 5:16 16:17 22:7
**counseling** 33:10
**counselor** 9:20 10:11
**county** 4:14 9:9, 11,12 10:20 17:11
**couple** 17:9,16,23 29:6 32:16
**court** 4:19 8:4 19:24
**courtroom** 7:7
**cover** 12:10
**covered** 20:2 22:6
**current** 9:17

D

**dance** 11:3
**Dante** 32:7
**Dante(ph)** 32:6
**date** 5:2 7:13 24:18,20
**deal** 13:6
**deposed** 6:5
**deposition** 5:6 6:2,15,23 21:13 22:4,18 33:23
**depositions** 5:20
**describing** 14:10
**designated** 22:4
**detailed** 26:16
**details** 18:4
**difficulty** 18:19
**digression** 23:18
**dinners** 27:10
**director** 9:20 10:7, 8
**disciplinary** 20:11
**discipline** 20:8 23:12 31:17
**disciplined** 20:13 21:17
**discoverable** 20:14
**discretion** 16:16
**district** 19:23 23:10
**divulge** 19:10,20 20:18 21:17
**documents** 6:20
**DONOVAN** 4:7 19:12,22 20:3,7,10 21:6,11,23 22:2,12, 17 23:4,17
**draw** 12:19
**drinking** 17:4
**drive** 27:18
**drug** 14:12 15:4
**drugs** 32:20
**DUI** 13:12
**duly** 4:4
**duty** 13:9

E

**early** 14:14 28:22
**education** 23:11
**educational** 23:9 26:17
**emphasis** 11:12
**employed** 9:4,7,9
**employee** 29:1
**employer** 22:16,19
**enforce** 14:21,23 15:1
**engage** 8:9
**enter** 11:14,15
**entity** 24:9
**episode** 17:10
**ethics** 26:15
**eventually** 31:22
**exact** 18:4
**EXAMINATION** 4:6 32:14
**examples** 12:22 13:7
**exhibit** 24:11,12, 13
**expect** 11:21 12:3, 18 14:20
**expectations** 11:17,19,24 12:15

F

**fact** 30:9
**Fair** 5:19 9:21
**fairly** 14:13
**Family** 23:8
**fast** 8:10
**federal** 22:11
**feel** 24:2
**fell** 13:16
**felony** 30:24
**felt** 26:17 27:1,3
**FERPA** 19:15 20:19 23:10
**figure** 22:22
**file** 20:15
**fine** 6:17 8:2
**finish** 8:11,20
**first-time** 15:10
**fix** 28:14
**football** 4:15 9:18 10:2 11:8 13:8 16:3 17:3 20:13,17 28:6 29:12,20 31:10
**Forest** 4:24
**form** 23:23
**found** 31:18
**Frank** 26:3,4
**Friday** 17:13
**friends** 27:7
**front** 7:6
**full-** 9:22

G

**game** 16:13 17:11, 17 18:9 29:12
**games** 15:5 17:24
**Gannon** 17:5 24:1, 17 25:2,19 26:13 27:7,13
**gave** 6:1
**general** 14:19 29:14,18
**generally** 28:17 29:17
**get along** 27:12
**give** 5:2 6:22 8:3 13:7 19:17,19
**giving** 4:12 11:1 21:4
**glad** 19:17,18
**goal** 11:16
**goals** 12:10
**good** 4:17 11:11,22 16:5 26:17 27:4,12 33:17
**grades** 18:17
**grasp** 26:17
**grew** 4:9
**grounds** 16:5
**grow** 11:13
**guess** 14:13,17
**guidance** 9:20 10:11
**guidelines** 14:19, 21 15:3
**guilty** 30:24
**gun** 31:21
**guy** 13:11 28:2,10, 11,15
**guys** 17:16

H

**H-A-Y-W-O-O-D** 4:21
**habits** 26:14
**half** 17:1
**handed** 31:17
**handful** 5:19
**handle** 17:7
**happen** 13:1 15:18
**happy** 22:21
**hard** 8:9 11:21 32:8
**Haywood** 4:2,8,18, 23 5:5 8:23,24 9:3

21:16 22:24 32:12

**head** 8:5 9:18 10:1 11:8 28:6 29:20

**health** 10:22

**heard** 4:9 16:11 32:18

**Heights** 4:24

**helmet** 5:14

**helps** 17:1

**hey** 13:16 16:7,11 17:16 28:13 29:8, 14 33:16

**hierarchy** 24:6

**High** 9:4,8,9,12 21:18 24:22

**higher** 16:6

**Hills** 4:24

**hired** 26:6

**hiring** 26:8

**hold** 18:9

**holding** 18:11

**Holler** 28:15

**honest** 15:13 26:24 27:16 31:2

**hours** 29:1,12

**house** 31:7 32:18, 19

I

**idea** 4:17

**identification** 24:13

**identify** 21:3 33:1

**illegal** 19:16 21:16

**imagine** 25:9

**impose** 8:18 16:10

**inappropriate** 21:16

**incarcerated** 31:4

**incident** 30:24 32:17

**incidents** 18:1 19:5 20:4 24:9

**include** 23:12

**inclusive** 14:18

**individuals** 11:13

**influenced** 13:5

**information** 19:11,19 20:18 21:5 22:6,23

**injured** 5:14

**injury** 18:16

**inquire** 31:12

**instance** 15:2

**instruct** 22:9

**instructing** 21:11 22:3

**insurance** 6:8

**interacting** 27:13

**interested** 6:16

**involved** 6:10

**issues** 18:22 33:2

J

**Jerry** 27:20,22 28:13,16 29:3,9 30:2,10 32:17

**Jerry's** 29:15

**jersey** 18:10

**job** 11:8,9 25:16 26:21

**jobs** 9:23

**Jon** 21:7

**Jonathan** 22:3

**judge** 7:6 19:24

**jury** 7:7

K

**Kentucky** 4:24

**kid** 15:8,24 16:3 18:9,10,12,15

**kid's** 18:12

**kids** 13:1,2,4 15:19 16:19 23:2 25:13 31:21 32:4,21

**kids'** 18:22

**kind** 6:14 9:22 10:9 11:19 12:9 13:16, 20 17:15 24:3 29:1

**knee** 18:16

**knew** 24:7

**knowledge** 13:15 18:22 24:8

L

**lady** 30:20

**lap** 13:17

**late** 28:23

**law** 22:11 23:7

**lawyers** 7:1,10

**leadership** 27:1

**learn** 31:9

**leave** 11:14

**lesser** 16:10

**letter** 24:16,18 25:3,5

**letters** 25:6,13,15

**lines** 12:4

**listed** 9:19 15:11

**listening** 23:21

**litigation** 6:11,14

**lodged** 20:5,6,7

**long** 6:24 9:4 10:1, 6,11 15:24 24:22 25:9,15 26:10

**lost** 9:5

**lot** 4:10,14 9:1 12:10 14:14 18:21 25:6,10,13 27:15 28:20 32:4

**love** 23:19

**low** 18:17

M

**made** 17:10 33:3

**main** 11:12

**maintenance** 28:10

**major** 6:4

**make** 7:23 18:21 32:24

**making** 18:9

**man** 15:2

**manager** 28:1

**manner** 12:19

**manners** 11:22

**Mark** 25:19 27:7

**marked** 24:11,13

**math** 10:21

**matter** 17:21

**Meade** 9:9,12 10:20

**means** 7:4

**meet** 11:16

**meeting** 4:11

**mentioned** 33:8

**message** 15:16

**met** 28:4

**middle** 8:19 10:20, 23

**mind** 6:13 19:4 21:4

**mine** 20:24

**Mingo** 4:14

**minors** 19:2 21:21

**minutes** 32:24

**Mm-hmm** 11:10 14:2 29:2

**motion** 20:15 21:24

**Mountain** 33:11,12

**move** 23:5

**mutual** 27:12

**myriad** 18:19

N

**named** 32:6

**names** 19:1,4 21:17 23:11,24

**nature** 25:1 32:21

**Neal** 21:7,10 22:2

**necessarily** 17:6 20:2

**needed** 7:22 28:10,18,24 29:11

**newspaper** 18:11

**night** 13:12 17:12, 13,14

**nights** 17:13

**normal** 8:9

**notice** 4:4 19:18
**noticed** 21:12
**notification** 21:18
**number** 5:3 29:4, 15
**numerous** 20:3

O

**oath** 7:2
**object** 19:20
**objection** 7:10 19:8 20:5 22:8
**observed** 26:14
**occasionally** 27:17
**occurred** 13:8 32:17
**October** 32:18
**offenders** 15:15, 22
**offense** 15:10,11, 12
**offer** 26:18
**offering** 26:12
**officially** 9:19,22
**opened** 27:24
**opinion** 25:10
**opportunity** 19:19
**opposed** 8:5
**order** 11:16 19:22 20:2,20
**organized** 26:16
**outset** 22:18
**overnight** 32:2
**overseeing** 28:3
**OWSLEY** 21:10
23:7

P

**P-H-I-L-L-I-P** 4:20
**p.m.** 33:23
**paid** 30:10
**parents** 13:16 15:8 18:5 19:17,18 21:21 23:2 33:3
**part** 6:4
**part-time** 9:19,20, 22 10:6,10
**parties** 32:19
**party** 5:22 6:11 30:21 31:7,10
**pass** 32:13
**past** 15:21 28:6
**PE** 10:22
**penalties** 16:10,15
**people** 4:14 9:16 11:13 14:14 25:14 30:7
**percent** 15:10
**perfectly** 15:13
**period** 32:1,3
**person** 13:5 16:7 33:12,16
**personal** 7:15 12:1 27:7
**Phillip** 4:2,20
**phone** 29:4 30:10, 11
**physical** 4:23
**Pike** 17:11
**Pikeville** 13:13
**place** 24:7 31:7
**Plaintiff** 4:3
**play** 4:15 17:13
**played** 17:12
**player** 5:13 12:6 32:5
**players** 11:17 12:22 14:22 16:10 17:3,8,23 31:10
**pleasure** 4:10
**pled** 30:24
**policy** 13:19,23,24 14:1,3,5,8,9,12,13, 16 15:3
**position** 23:5,16 25:22
**practice** 11:22
**prefer** 8:23
**preserve** 7:13
**Prestonsburg** 9:12 10:22
**pretty** 27:4 28:19 29:17
**prevalent** 14:13
**principal** 16:7,20 18:3 24:1,4,21,23 25:19 26:2,10
**prior** 10:16 17:13 24:24
**privacy** 18:13,22, 24 19:2 20:23 23:9
**privilege** 19:13,15 21:14 22:6
**privy** 15:18
**problem** 28:13 31:22
**procedures** 13:21 23:12
**produce** 11:11
**program** 11:11,14 12:12,20 13:8 14:17
**prom** 13:3,12
**pronouncing** 32:8
**properly** 21:12 22:4
**property** 30:21
**protect** 19:2
**protective** 19:22 20:2
**public** 13:14 18:21
**published** 14:5
**punished** 17:4 19:5
**punishing** 17:8
**punishments** 24:1
**pursuant** 4:3
**put** 6:19 18:11 19:18 21:6 28:20 31:21

Q

**quarter** 16:13,24
**question** 7:12 8:12,19,20 21:12 22:4,17 26:7
**questioned** 17:18
**questions** 6:24 7:1,11 8:4 32:12,16 33:20,21
**quick** 24:12 32:16
**quickly** 29:17

R

**raise** 22:8
**raised** 23:15
**ran** 24:2
**readily** 28:18
**reason** 31:15
**reasons** 18:20
**recall** 6:16 17:2,8 19:4 24:19 25:5,21 26:4 27:13 32:5
**recitation** 22:11
**recite** 23:14
**recognize** 24:15
**recommend** 26:19
**recommendation** 24:16 25:7,16 26:13,18
**recommended** 25:21 26:4
**record** 4:19,23 5:1 21:7,24 23:7,14
**records** 19:20 20:8 23:11,12
**recruit** 29:24
**recruiting** 29:23
**redact** 19:1
**reduces** 15:10
**referred** 23:9
**referring** 23:8
**reflected** 4:22 5:1
**reflecting** 12:23
**reflection** 12:19
**related** 30:24
**release** 23:1,11
**remember** 26:1,23
**remembers** 18:4
**remove** 16:3
**report** 18:1 23:24 24:8

**reporter** 4:19 8:4
**represent** 20:17
**representatives** 12:12,16 13:10
**represented** 22:15
**represents** 22:12
**respect** 11:22 18:23 27:12
**responded** 29:17
**response** 7:11
**result** 33:2
**rights** 20:22 23:9
**Rod** 25:20,21 26:2
**rule** 29:14,18
**rules** 7:24 14:24 15:1
**run** 7:23 16:6
**running** 13:9
**Ryan** 22:21 23:16

S

**Saturday** 17:14
**school** 9:4,7,8,10, 12 10:20,23,24 12:12,13,16,17,20 13:10,24 14:1,7 15:7 20:9 21:18 23:10 24:6,22 25:11 27:14,24 28:10 33:13
**school-related** 27:16
**science** 10:21
**searching** 31:20
**second-** 15:14
**second-time** 15:11
**Security** 5:2
**send** 29:15
**sessions** 33:10,16
**set** 15:6
**settlement** 6:5
**shaking** 8:5
**Shaw** 19:9,17 20:1, 8,22 21:1,7 22:3,8, 15,19 23:8 32:15
**short** 8:16
**sideline** 18:15,17
**sidelines** 18:10, 18,20
**sign** 20:19
**signed** 19:23
**sit** 16:12,24 17:23 24:4
**site** 28:1
**sits** 21:2
**sitting** 23:19
**situation** 33:4
**skills** 27:4
**slipping** 6:13
**Smith** 7:17,20 11:5,6 19:8,10,14, 21 20:6,12,24 21:4, 7,15 22:1,2,14,21 23:6,8 33:22
**Smith's** 22:10
**Social** 5:2
**solicit** 22:24
**song** 11:3
**sounds** 31:6
**speaks** 21:10
**spell** 4:18
**spoken** 17:2
**spring** 24:24
**standing** 18:18,20, 24
**starting** 14:14
**state** 7:10
**States** 19:23
**statute** 23:13
**stayed** 15:15 28:22
**staying** 18:15,16
**stop** 26:8
**student** 18:24 21:19 23:24
**student's** 20:22
**students** 19:5,20 20:1 21:3,17,19 23:1 33:1
**students'** 23:11
**subject** 10:24 19:22
**sued** 6:6,8
**suing** 6:6
**suit** 5:14
**Supposed** 24:20
**suspended** 15:4
**Swafford** 27:20,23 28:5,17 30:2,13,18, 23 31:3
**Swafford's** 29:4 30:10 31:7 32:18, 19
**sworn** 4:4
**system** 26:17

T

**talk** 8:10 16:19,21 18:6 21:20 31:8
**talked** 17:21
**talking** 15:3 19:14, 15
**talks** 16:20
**taught** 10:19,20, 22,23,24
**teach** 10:18
**teacher** 10:13,17 18:19
**team** 13:23 15:15, 22 16:3,11 17:4 32:4,5
**teammates** 12:7
**tend** 8:10
**terms** 31:16
**territory** 12:10
**testified** 4:4 17:5 32:23
**testimony** 7:13
**text** 29:15
**thing** 8:2,12,15 12:6
**things** 9:2 10:19 11:23 12:22 13:1,7 15:11,17 16:18 24:6 26:16 31:21
**third-time** 15:12
**THOMPSON** 21:9 33:21
**thought** 17:5 31:18
**time** 4:12 6:3 8:10, 17 9:2,23 11:2 15:15,16,22 16:21 28:20 32:1,3,8,11
**times** 7:9 16:22 25:18
**title** 9:16 28:2
**titles** 9:17
**tobacco** 14:12
**today** 4:9,12 6:20 7:2,5,9,14,18 8:10, 17 11:2 21:2 22:13 32:11
**ton** 25:8
**tore** 28:11
**torn** 29:9
**track** 9:5
**traffic** 6:3
**training** 15:5,9 33:8,9
**treat** 12:7,8 14:8
**treated** 12:7,9
**tremendously** 17:1
**trouble** 16:12
**true** 17:18 20:4
**truthfully** 7:5
**type** 11:23 33:10

U

**uh-huh** 8:6
**understand** 7:2,4 22:5 23:4,15
**understanding** 7:17 30:16
**United** 19:23

V

**Valderama(ph)** 32:9
**Varney** 25:20,21 26:2
**vehicle** 27:17
**verbal** 8:3
**vicinity** 9:6

**violate** 22:20

**violation** 15:4 20:19

W

**wait** 31:18

**Waiving** 20:22

**wanted** 4:15

**ways** 28:8

**week** 18:17

**weekends** 28:21 32:20

**weight** 25:10,12

**Welch** 26:3,5,10

**Williamson** 4:9

**witnesses** 17:2

**word** 17:15

**work** 11:21 21:2 22:21 26:14,15 27:9 28:5 29:1,19

**worked** 30:3

**working** 30:6

**worry** 29:22

**worthwhile** 26:18

**write** 25:2,4,6,8,13

**written** 14:3 25:15 27:2

**wrong** 13:5

**wrote** 24:16,19

Y

**year** 17:10 29:6

**years** 5:20 9:5,13 10:3,10 12:21,24 13:12 21:19 24:23 26:11

**yell** 23:21

**yesterday** 17:5

**young** 11:13 13:4,11 15:2 30:20



# A COMPREHENSIVE HIGH SCHOOL

Post Office Box 160 • U.S. Highway 119
Belfry, Kentucky 41514
606-237-3900
Fax: 606-237-5119

Rod Varney
Principal
Philip Haywood
Guidance Director

John F. Hunt
Assistant Principal
Anita Lequire
Secretary
Ruth Marie Pauley
Guidance Counselor

To whom it may concern:

I am writing in reference to Mark Gannon, presently an assistant principal at Belfry High School. Mark served as a teacher and did an excellent job in the classroom for many years before moving into administration. He was in charge of the development of our 9th grade academy when our new school opened and it was a great success. Mark has matured as an assistant principal and has earned the respect of the faculty and students. He is hardworking, dependable, and conscientious. One of his greatest strengths is that he is consistent, firm, and fair in dealing with kids and every decision is based on what is best for the student. Mark works well with parents, and the faculty knows he will be supportive of their efforts. Mark will definitely be an instructional leader. He has a very good grasp of what it takes to run a school, and along with his excellent leadership characteristics, Mark makes an ideal selection for the principal of Belfry High School.

I highly recommend him.

Sincerely,

Philip Haywood
Guidance Counselor/Head Football Coach

EXHIBIT
HAYWOOD
1
5-17-16