

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF KENTUCKY

3  K.D.,

4       Plaintiff,

5  v.              Civil Action No. 7:17-cv-132-KKC

6

7  JERRY SWAFFORD, in his individual capacity;
THE PIKE COUNTY BOARD OF EDUCATION,
REED ADKINS, in his individual capacity; and

8  MARK GANNON, in his individual capacity.

9       Defendants.

10

11

12

13      The deposition of KEVIN DESKINS, taken upon

14  oral examination, pursuant to notice and pursuant to the

15  Federal Rules of Civil Procedure, before Kimberly

16  Wooten, Court Reporter and Notary Public in and for the

17  State of Kentucky, Wednesday, May 17, 2018, at the Pike

18  County Board of Education, 316 Mayo Trail, Pikeville,

19  Kentucky.

20

21

22           REALTIME REPORTERS

23             713 Lee Street
Charleston, WV 25301
(304)344-8463

24           www.realtimereporters.net

```
 1                    APPEARANCES

 2   On behalf of K.D.:

 3        Ryan McCune Donovan, Esquire
          William Flynn, Legal Assistant
 4        Bailey & Glasser, LLP
          209 Capitol Street
 5        Charleston, WV  25301
          (304) 345-6555
 6        rdonovan@baileyglasser.com

 7   On behalf of Mark Gannon and Reed Adkins:

 8        Jonathan C. Shaw, Esquire
          Porter, Banks, Baldwin & Shaw, PLLC
 9        327 Main Street
          Paintsville, KY  41240
10        606) 789-3747
          jshaw@psbb-law.com

11
     On behalf of the Pike County Board of Education:
12
          Neal Smith, Esquire
13         General Counsel, Pike County Board of Education
          316 South Mayo Trail
14        Pikeville, KY  41501
          (606) 433-9208
15        neal.smith@pike.kyschools.us

16        Michael A. Owsley, Esquire
          English, Lucas, Priest & Owsley, LLP
17        1101 College Street
          Bowling Green, KY  42102
18        (270) 781-6500
          mowsley@elpolaw.com

19
     On behalf of Jerry Swafford:
20
          Mark K. Thompson, Esquire
21        Smith Thompson & Kennedy, PLLC
          140 Scott Avenue
22        Pikeville, KY  41501
          (606) 432-2156
23        maxthompson@setel.com

24
```

1                    EXAMINATION INDEX

2    KEVIN DESKINS

3    Examination by Mr. Donovan                    Page   4

4    Examination by Mr. Shaw                       Page  23

5    Examination by Mr. Smith                      Page  27

6

7

8

9

10

11

12

13

14                      EXHIBIT INDEX

15   DEFENDANTS EXHIBITS

16   No. 1   Sworn Declaration of Carla Walker     Page  18

17

18

19

20

21

22

23

24

```
 1              P R O C E E D I N G S
 2                 KEVIN DESKINS
 3   was called as a witness by the Plaintiff, pursuant to
 4   notice, and having first been duly sworn, testified as
 5   follows:
 6                  EXAMINATION
 7   BY MR. DONOVAN:
 8       Q.   Thank you for being here, I appreciate your
 9   time.  Are you in the classroom today?
10       A.   Well, we had a little testing this morning, so
11   it was -- we had a little gym time today, it was a fresh
12   one, we just -- so it was a little mixture.
13       Q.   So in other words, you're thrilled to be here?
14       A.   Yeah, it's not, not bad.  I get to feed myself
15   without feeding two kids for an afternoon, worrying
16   about what they want to eat.
17       Q.   Okay.  Would you mind spelling your first and
18   last name.
19       A.   Kevin Deskins, K-E-V-I-N, D-E-S-K-I-N-S.
20       Q.   Not to be reflected on the record, Coach
21   Deskins, could you tell us your physical address.
22       A.   ██████████████  -- D-I-X Fork Road --
23   Sydney, Kentucky, 41564.
24       Q.   Thank you.  Also not to be reflected on the
```

1  record, could you tell us your birth date and Social

2  Security number.

3      A.        ███████████.  Social Security number is

4  ████████.  Did you get that last one?  ████.

5      Q.  She'll get it.

6          Okay.  Have you ever given an deposition

7  before?

8      A.  Nope.

9      Q.  Okay.  Well, I don't know if you read anything

10  about it ahead of time, but just to give you a quick

11  primer.  Deposition is a lawyer word for interview,

12  basically.

13      A.  Right.

14      Q.  I am going to ask you some questions, some of

15  the other lawyers might ask you some questions.

16          I represent Kendall Dotson.

17      A.  Okay.

18      Q.  Who is the plaintiff in this case.

19      A.  Okay.

20      Q.  And what makes this different than normal

21  interview, is that of course you are under oath.

22      A.  Right.

23      Q.  Do you understand that?

24      A.  Right.

1    Q.   And that means you have to tell the truth just
2    like if we were in a courtroom with a judge and jury and
3    a bailiff.

4    A.   Sure.  I teach a law and justice class.

5    Q.   Excellent.

6    A.   So I'm --

7    Q.   All right.  Couple of other things.  First of
8    all, from time to time some of the lawyers around the
9    table here, a lot of them may make an objection.  If we
10   do object, most of the time you'll be instructed to
11   answer the question.

12   A.   Yes, sir.

13   Q.   We are just preserving the objection for the
14   record.

15   A.   I understand.

16   Q.   Maybe some limited circumstances in which you
17   would be instructed not to answer, but we'll cross that
18   bridge when we get there.

19   A.   Okay.

20   Q.   I would ask you to, a couple things, just to
21   help the court reporter out.  First of all, giving "yes"
22   or "no" affirmative answers, instead of shaking your
23   head, saying "uh-huh."  And it will be a lot easier for
24   her if I wait for you to finish your answers before I

1  jump in and ask you another question, and if you could
2  do the same for me.

3      A.    Yes, sir.

4      Q.    And if we get too out of line with that,
5  she'll remind us.

6           The only other thing, I think we're only going
7  to be here a few minutes today, but if for some reason
8  you would want to take a break, you can absolutely do
9  so.  I would only ask that if I've started a question,
10 you let me finish it and you answer before we take that
11 break.

12     A.    Okay.

13     Q.    Is that fair?

14     A.    Yes, sir.

15     Q.    Okay.  Very quickly, and I won't take you
16 through the whole thing we normally do, but are you a
17 teacher at Belfry High School?

18     A.    Yes, sir.  This is, I believe, my 15th year in
19 education, this is my 10th year at Belfry High School.

20     Q.    Where were you before Belfry?

21     A.    The first two years, I was at Pike County
22 Central; and then I spent two years, as well, at Belfry
23 Middle School; and then from there, I moved to the high
24 school.

1    Q.   Are you a coach, also?

2    A.   Yes, sir.  I coach girls basketball.  I have

3  coached girls softball, as well, before I got into that.

4  And then spent a few years coaching high school football

5  at Belfry, as well as middle school football at Belfry.

6  And then I've coached everywhere, being basically that's

7  what -- what I have to do.

8    Q.   How long have you been a coach -- or were you

9  a coach at softball?

10   A.   Two years.

11   Q.   And what period of time was that?

12   A.   That's a tough one.  So I'm guessing it was

13  maybe -- I can't think specifically, I would have to

14  look at like KHSA.  I'm thinking it was like the '05-'06

15  season, maybe two consecutive seasons there.  To be

16  honest, I'm not real sure, time blends on me.

17   Q.   Could it potentially have been during 2007?

18   A.   Yeah, possibly, yes.  Once again, I'm not real

19  sure on that as far as the exact dates go.

20   Q.   Okay.  Did you have any other jobs prior to

21  teaching at PCHS?

22   A.   No.  I was kind of straight out of college.  I

23  worked, of course, in Lexington at restaurants, a tech

24  lab.  And then I came back here and got in part of that,

1   the MAT program, and then started teaching at Pikeville

2   Central.

3       Q.   Did you go to UK?

4       A.   I did go to UK.

5       Q.   Okay.  For your undergrad?

6       A.   For undergrad, yes, sir.

7       Q.   Is that where you also got your master's?

8       A.   No.  I got master's through Morgan State.

9       Q.   Okay.  Did you play ball at UK?

10      A.   No.

11      Q.   I thought maybe --

12      A.   No.

13      Q.   -- I had seen you on the end of the bench at

14  some point, Pike UK guy?

15      A.   Just on the courts where the people who can't

16  play, play, that's where I played at.

17      Q.   Okay.  Do you have an understanding of what

18  this case is about?

19      A.   For the most part, yes, sir.

20      Q.   Okay.  Did you know Kendall Dotson?

21      A.   Not real well.  I've never had her in class,

22  I'm not sure -- I'm pretty sure like she maybe moved to

23  the school, I don't think she spent the whole four years

24  there, so I wasn't -- I didn't really know her.  I kind

1  of would know her as a recognizing, but as far as
2  knowing anything about her, I didn't.

3      Q.   Okay.  Do you know anything about what her
4  allegations are in this case?

5      A.   Just from what's been, you know, kind of in
6  the mainstream media, you know, as far as kind of what
7  the newspaper has kind of posted, you know.  Basically
8  the first time I heard about here was like when his
9  picture was in the paper, that's kind of the gist of it.

10     Q.   Did you ever meet with Mr. Smith about this
11 case?

12     A.   Yes, sir.  I met just briefly, I guess it's
13 been maybe a few weeks ago, I can't really -- as far as
14 time goes, I'm not real sure, it's -- I just, a few
15 weeks ago.

16     Q.   Okay.  And what did you and Mr. Smith talk
17 about?

18     A.   He just asked questions, much like what you
19 are doing, I guess asking, you know, certain things
20 about -- you know, nothing as far as in detail.  I guess
21 there was -- I'm trying to think in particular -- maybe
22 I guess that there was a connection with a basketball
23 player maybe from Jim Buchanan, I guess -- yeah, I
24 think -- yeah, I'm trying to think of her name.

1      Q.    Is that Bree Harrington?

2      A.    Brianna Harrington.  She was at Jim Buchanan,

3   I think she's not a county or something.

4      Q.    Okay.  Did you know Brianna Harrington?

5      A.    Briefly met her.  She was at a ball game with

6   Brittany Swafford, which is Jerry's daughter.  And I

7   think it was a Pike County Bowl, and I remember kind of

8   passing them and the daughter introduced me to her, and

9   that was kind of the gist of it.

10     Q.    Did you know anything about where she was

11  staying at that time?

12     A.    No, not in particular.  I knew she -- I knew

13  she was kind of, I think at Jim Buchanan just through

14  kind of the basketball things.  Because, you know, I

15  kind of keep up with everywhere -- and they were really

16  good, because they had another girl, Profit(ph) -- but

17  outside of that, I didn't really know anything about

18  her -- her situation.

19     Q.    What is Jim Buchanan?

20     A.    It's like a -- it's not necessarily a private

21  school, I think it's like a -- I don't really know what

22  Jim Buchanan is.  They still play in district play, in

23  regional play.  I think it's kind of like one of those

24  independent schools.

1     Q.   Okay.  So you saw her at a ball game; do you

2  remember running into her anywhere else?

3     A.   No.

4     Q.   Okay.  What else did you and Mr. Smith talk

5  about?

6     A.   I think there was a conversation that I said

7  something in class, or said something to Carla Walker,

8  just about, I don't know, I guess somewhat about the

9  case or whatever.  I guess that very day that everybody

10  found out that -- just that I think that there was

11  something that I supposedly said, or I've said, and that

12  was -- it was kind of what it was about.

13     Q.   Did Mr. Smith explain to you or mention

14  anything about whether it mattered in this case that the

15  school or School Board knew anything about Jerry

16  Swafford before the incident happened?

17     A.   No, we just, it was more based on, I guess, my

18  connection to it.  There was really no specifics about

19  anything else.

20     Q.   Okay.  Sure.  Well, we're almost done, I

21  promise.

22     A.   That's okay.

23     Q.   Let's talk about that incident Mr. Smith asked

24  you about.  Were you teaching in a classroom at Belfry

1   High School on the week of, I guess it would have been
2   October 16th --
3       A.   Yes.
4       Q.   -- of 2016?
5       A.   Yes.
6       Q.   What were you teaching?
7       A.   I have two separate, I have a law and justice
8   class, as well as -- for two class periods, and I also
9   have a freshman world geography.
10          As far as content, I would have to maybe look
11  at some lesson plans and kind of see where I was at.
12  Law and justice, I know early on this semester we talked
13  a little bit about criminal profiling, and before moving
14  into like forensics.  I do know kind of that aspect of
15  it because we spend the better part of the first nine
16  weeks on that.
17      Q.   Okay.  Do you have Carla Walker as a student
18  -- or did you have Carla --
19      A.   I did, yes, sir.
20      Q.   Okay.  And do you recall whether she would
21  have been in your classroom that week?
22      A.   She -- I'm sure she would have.  I'm not sure
23  if she was really like a first or second period, but I
24  do know that she did take that course that year.

1    Q.    How much do you remember -- how much detail do

2 you remember about that week?

3    A.    Vaguely.  You know, honestly it's like,

4 teaching is like ground hog's day, you know?  You show

5 up, it's like, I mean, you know, like I said, I'm not

6 real sure even when I coach softball, I know it was 10

7 years prior, like I know it was, but it's kind of like

8 ground hog's day.  I don't know, not necessarily much

9 about it, honestly.

10    Q.    This might sound like a silly question:  But

11 do you recall everything you said to your students

12 during that week?

13    A.    No, I can't say that I could.  But the only

14 thing I could possibly do is maybe, you know, describe

15 maybe a little bit of maybe my mindset or the approach,

16 you know, that I take with kids as far as, you know, the

17 information I always talk to them about.

18         I do remember somewhat of that week,

19 especially the day of that -- I guess he was released in

20 the paper, the article released in the paper -- that,

21 you know, the kids kind of came in out of class and they

22 were constantly, you know, talking about it, because it

23 was really the first time for, you know, everybody.

24         And I felt like I was out of the loop, because

1  I was, you know, I didn't hear about it.  I walked in
2  and I remember, you know, like -- I guess, I can't
3  remember if I talked to Coach Comer(ph) or whatever, and
4  he kind of showed me the picture of the news article or
5  whatever, and it was, you know.

6       And then I remember just as the kids come in,
7  I was trying to -- to get them back on task and get them
8  what, you know, back into what we were doing.  So, you
9  know, if there were any kind of discussions about any of
10 that stuff, it would have been very limited as far as
11 what we would have done, just because, I just, you know,
12 I don't take a lot of time for stuff like that in class,
13 especially, you know, when there was -- you know, I
14 didn't know any of the details necessarily.

15      Q.   Were you surprised to hear about --

16      A.   I was shocked.  You know, I spent -- you know,
17 I spent a lot of time at that school coaching sports or
18 whatever, and, you know, I have a young daughter and,
19 you know, there was, you know, multiple times that I --
20 you know, say we was like at the Mountain Boy School
21 Classic, and I remember having to go back downstairs and
22 leaving my daughter, you know, at the table.  She was
23 sitting there with Jerry or whatever and, you know, he
24 said that he'll bring her back down and, you know, there

1  was never a thought about it, you know.

2          Then when the situation occurred or whatever,

3  it's just, you know, when I reflect back, I never really

4  had that, that fear about that, or -- you know, because,

5  you know, I guess somewhat I'm too trustworthy or

6  trusting or whatever, but that's...

7     Q.   Okay.  We've spoken to Carla Walker about this

8  case, and she gave us a written statement that she

9  executed under oath, and we have shared this statement

10  with the Board of Education.  Have you seen it?

11     A.   I haven't seen it, no, sir.

12     Q.   Okay.  In her declaration, Ms. Walker says

13  that on October 16th, she was a student at Belfry High

14  School; is that accurate?

15     A.   That's accurate, yes, sir.

16     Q.   She also said that she was in Mr. Deskins

17  classroom at Belfry High School and word started to go

18  around and that Jerry Swafford has been accused of

19  sexually assaulting K.D. at a party that weekend.

20          Is that accurate?

21     A.   Yes.

22     Q.   Is there another Mr. Deskins?

23     A.   No.

24     Q.   Just checking.

1     A.   Certainly.  No.

2     Q.   Carla says that, and I'm quoting her statement

3  here, "When Mr. Deskins heard the news, he seemed very

4  upset."

5         Is that accurate?

6     A.   Yeah, that's very accurate.

7     Q.   And said, quote, "We all knew something like

8  this was going to happen."

9         Is it possible that you said that?

10    A.   In that context, no.

11    Q.   Well, is it possible that you said those

12  words?

13    A.   Who is "we?"  I don't understand that

14  statement.

15    Q.   Sure.  We can --

16    A.   Right, right, that's what I'm saying --

17    Q.   -- for now, let's stick to the question --

18    A.   That's what I'm saying, like assuming -- I

19  can't be a hundred percent positive, that does not sound

20  like my approach that I would have taken in class at

21  that time.

22         Understanding that I was shocked, in awe at

23  that.  Yeah, absolutely I was, it was, you know,

24  especially the moment teaching, you know, like a

1   criminal profiling or whatever, you know, I'm pretty
2   good at that kind of stuff, you know, just
3   understanding, I -- I didn't get that.  If I did say
4   that statement, as far as like -- can you say it to me
5   again?  I'm sorry, I'm not --
6       Q.   Sure.  "We all knew something like this was
7   going to happen."
8       A.   That just, it don't sound like the right
9   context.  If it was maybe like --
10          MR. SHAW:  Here's a copy of the statement.
11          MR. DONOVAN:  Oh, I'm sorry.
12          (Exhibit No. 1 marked for identification.)
13      A.   I will never say that it's not possible.  If I
14  said something like that, it wasn't necessarily the
15  intention, it was, you know, sometimes I generalize a
16  whole lot, you know.  And I often spend time thinking,
17  like it doesn't surprise me, I shouldn't ever be
18  surprised as far as what was occurring, you know, like
19  the trusting of people and the judgment.  But as far as,
20  I don't think that's a fairly accurate statement that I
21  would say.
22      Q.   Okay.
23      A.   I just, it don't -- when I read that, it just
24  doesn't appear or sound like that's the way that I

1    approached that.  And all I really remember is my
2    general approach of, of kind of consoling kids, kind of
3    getting them to chill out and trying to maybe take their
4    mind somewhere else.

5            Of course, she probably did see that, because
6    I -- it was an early morning class.  So when I found
7    out, like I said, I knew nothing prior to that moment,
8    it kind of whigged me out little bit -- more so over my
9    daughter kind of being around him, opposed to actually
10   the situation.  Just kind of I reflected back on all the
11   times that, you know.

12           And of course maybe I felt somewhat of the
13   guilt, like maybe I should have known, you know.  Like
14   just where I've studied law and justice, and I've
15   studied psychology and sociology, but it just -- I guess
16   that's kind of how, maybe how I felt.

17           And I don't know, maybe I said something like
18   this in a sense, and maybe the way that she took it was
19   a little bit different -- because sometimes kids take
20   the things that you say I guess a little bit too
21   literally -- but, you know, I don't feel like that, that
22   was something that I -- the intent of it, I'll just, I
23   don't know, it just... I don't know, I just...

24       Q.   Sure.  And I appreciate your candid answer to

1 that, and, you know, you're not on trial --

2    A.   Right, absolutely not.

3    Q.   Nobody is accusing you.

4    A.   Trying to be as forward, like help you out

5 with all the details that I can.

6    Q.   Appreciate that.  So a lot to process there,

7 but is it safe to say then that you think it's possible

8 that you said that and she took it out of context?

9    MR. SMITH:  Objection.  I think he's already

10 answered that question, he said he did not think that

11 was something he would say.

12    Q.   You can answer that.  We can preserve the

13 objections, but they don't need to be speaking

14 objections.  You can answer.

15    A.   I don't feel -- no, I don't feel like I said

16 that, if -- the way that it's quoted, I don't feel like

17 I've said that in that context.  I don't know why I

18 would say "we" all knew, who -- include in that, I don't

19 feel like that's something that I've said.

20    Q.   Okay.  Do you think that Carla Walker is

21 lying?

22    A.   No.  But just with my, you know, working with

23 kids or whatever, kids hear what they want to hear, so

24 oftentimes they -- you know, I never remember having a

1  direct conversation with Carla about any of the
2  situation, I'm not sure kind of how, how she took it or
3  whatever.
4          You know, I'm not going to say Carla is a
5  liar, because I just, I like Carla.  I just recently
6  wrote her recommendation for a scholarship to Louisville
7  which she got, you know, which is -- you know, not that
8  I'm ever going to hold anything like this against her --
9  so I think it's just maybe just some misinformation.
10 Maybe it's just, you know, maybe the way that she took
11 what I said or whatever, but it was not the right
12 intention.
13     Q.    Thank you for that.
14     A.    You're welcome.
15          MR. SMITH:  Kevin.
16          THE WITNESS:  Yes, sir.
17          MR. SMITH:  I noticed that this --
18          MR. DONOVAN:  Hold on a second, Neal.
19          MR. SMITH:  I thought you were finished.
20          MR. DONOVAN:  Neal, I will pass the witness to
21 you when I'm ready to pass the witness to you.
22          MR. SMITH:  I thought you were finished.
23          MR. DONOVAN:  No, I'm not finished.
24          MR. SMITH:  Okay.

 1          MR. DONOVAN:  So I'll pass the witness and

 2    then you can --

 3          MR. SMITH:  Go ahead.

 4    BY MR. DONOVAN:

 5      Q.    You mentioned that you may have been a

 6    softball coach in 2007?

 7      A.    I would have to, I would have to go back and

 8    look at -- maybe not.  I'm trying to relate it with

 9    football, because I coached football with softball at

10    the same time.  I think that might have been the year

11    prior -- or, I'm sorry, the year after I gave it up, I'm

12    just not real sure on the logistics of it.

13      Q.    Sure.  Well, that particular piece of

14    information is not necessarily important.

15          What I wanted to ask is:  Do you recall ever

16    coaching with having an assistant coach on the team

17    named Mark Kohari?

18      A.    No, that was not me.

19      Q.    Okay.

20      A.    That was the prior coaching staff.

21      Q.    So you are aware that Mr. Kohari was a coach?

22      A.    Yeah.  I never seen him coach, never been a

23    part of it, but I think he was -- maybe he coached

24    soccer, too.  I'm not really sure, because I always seen

1  him at -- I did see him at soccer, because I remember

2  running track.  Maybe he was just a parent, I'm not

3  sure.  But there was an incident, I think, where he

4  coached softball.

5     Q.   Are you aware of the circumstances under which

6  he stopped coaching?

7     A.   Not necessarily.  I know there was some

8  allegations.  I'm not even real sure -- I'm not even

9  real sure I was at the high school at that point --

10  maybe I was, I can't -- I mean, of course you kind of,

11  you know, catch wind of whatever.  But as far as the

12  logistics and the basis of all that, I just, I just knew

13  he wasn't supposed to be at school.

14     Q.   You didn't have any personal knowledge of why

15  he was kicked off the softball team?

16     A.   No.  No.

17     Q.   Okay.  That's all I --

18          THE WITNESS:  No.  I've never even had a

19  conversation with him, I don't think.  I just know him

20  because he's Dr. Kohari's brother and I know Dr. Kohari.

21          MR. DONOVAN:  Okay.  Your witness.

22                        EXAMINATION

23  BY MR. SHAW:

24     Q.   I believe you stated a minute ago that he was

1   probably -- he was maybe a parent coach?

2       A.    I'm not real sure.  I've not been around

3   soccer or nothing, I just, I'm up there all the time at

4   basically every sporting event and I kind of know what

5   he looks like.  I had his kid, Cameron, in class at one

6   point, and maybe a daughter, Mallory.  You talking about

7   the --

8       Q.    Well, the question was going to be:  Are the

9   coaches that assist, would be volunteer coaches that

10  would be parents or otherwise volunteer program, but

11  would not necessarily be paid coaches or employees of

12  the district?

13      A.    No, they would all have to come through this

14  system.  They would all have to be, like a parent,

15  professional, they would all have to come -- like any

16  time I've ever hired assistant coach, is that what

17  you're saying?

18      Q.    I'm talking about volunteers that assist with

19  programs --

20      A.    Not that I know of, like I --

21      Q.    The parent coaches?

22      A.    I'm not -- I'm not real sure.  What do you

23  mean by parent coaches?

24      Q.    Well, you mentioned parent coaches a minute

1  ago.  I apologize.  I was trying to figure out if you
2  had -- if there was a difference between volunteer
3  coaches and paid coaches?
4      A.    Oh, yeah, there's a difference, but I think
5  both of them still have to come through a background
6  check and --
7      Q.    Oh, yeah --
8      A.    Yeah, yeah, that's why I was saying --
9      Q.    -- still do background checks --
10     A.    Yeah, high school, we try to avoid parent
11 coaches.
12     Q.    The point is, you have coaches that both --
13 there on a volunteer basis, and you have coaches that
14 are paid through the district --
15     A.    Yes, sir.
16     Q.    -- or employees of the district, that
17 participate?
18     A.    Yes.
19     Q.    Okay.  All right.
20     A.    I'm sorry about that.
21     Q.    That's all right.
22          Now, the Plaintiff's complaint in this action
23 is essentially that for years the Pike County Board of
24 Education, that their employee, Jerry Swafford, hosted

1 parties at his home during which he plied children with
2 drugs or alcohol and sexually abused them.  The Board
3 was aware of the parties and other misconduct by
4 Swafford and did absolutely nothing.

5         You have been identified as a witness in this
6 case by the plaintiff as knowing something about
7 Mr. Swafford's misconduct.  Had you ever heard that?

8     A.    No.

9     Q.    Were you ever aware of any parties --

10     A.    No, sir.

11     Q.    -- at his house where he supplied alcohol or
12 drugs and allegedly sexually abused anyone --

13     A.    No, sir.

14     Q.    -- before the incident that occurred on the
15 weekend of October 15, 2016?

16     A.    No, sir.

17     Q.    Okay.  You're also identified as a witness as
18 having personal knowledge of similar misconduct by Board
19 employees and knowledge of Mr. Swafford's misconduct and
20 similar misconduct by other Board employees.

21         Do you know of any other Board employees that
22 on a regular basis would have plied students with drugs
23 and alcohol and sexually abused them?

24     A.    No, sir.

1    Q.   Okay.   You're also identified as a witness as
2    to the Board's efforts of the employees and agents to
3    cover up allegations of employee misconduct.
4         Do you know or are you aware of any incidents
5    where any staff member, employee or representative of
6    the Board of Education is trying to cover up or hide
7    allegations that a child has been sexually abused by a
8    teacher or other employee in this district?
9    A.   No, sir.
10   Q.   Okay.   I'll pass the witness.
11                   EXAMINATION
12   BY MR. SMITH:
13   Q.   Just one or two questions, Kevin.
14        I noticed this affidavit that somebody
15   prepared and Carla Walker signed is dated April 14,
16   2018, which is 18 months after the incident that
17   occurred at Jerry Swafford's home.
18   A.   Sure.
19   Q.   And Mr. Donovan asked you a moment ago if, in
20   your opinion, Carla was lying when she signed this
21   affidavit.   Do you think she might have just been
22   mistaken after 18 months as to what you might have said
23   that day?
24   A.   Yes, sir.

1       Q.    That's all that I have.   Thank you.

2             MR. DONOVAN:   Coach, thank you very much for

3   your time, appreciate it.

4             THE WITNESS:   You're welcome, guys.

5             (Deposition concluded at 5:14 p.m.)

CERTIFICATE OF COURT REPORTER:

I, Kimberly Wooten, a Notary Public and Professional Reporter within the State of Kentucky, duly commissioned and qualified, do hereby certify that the foregoing deposition was duly taken by me, the said witness having been by me first duly sworn.

I do further certify that said proceedings were correctly taken by me in stenotype notes, that the same were accurately transcribed out in full and true record of the testimony given by said witness to the best of my ability.

I further certify that I am neither counsel for, nor related to or employed by, any of the parties hereto or financially interested in the action.

Given under my hand this 27th day of May, 2018.


*Kimberly Wooten*
Kimberly Wooten
Professional Reporter/Notary Public

My commission expires: July 20, 2020

**Exhibits**

**Exhibit 1** 3:16 18:12

**0**

05-'06 8:14

**1**

1 18:12
10 14:6
10th 7:19
14 27:15
15 26:15
15th 7:18
16th 13:2 16:13
18 27:16,22
1980 5:3

**2**

2007 8:17 22:6
2016 13:4 26:15
2018 27:16
22 5:3
2856 4:22

**4**

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 5:4
41564 4:23

**5**

5:14 28:5

**9**

9086 5:4

**A**

absolutely 7:8 17:23 20:2 26:4
abused 26:2,12,23 27:7
accurate 16:14,15, 20 17:5,6 18:20
accused 16:18
accusing 20:3
action 25:22
address 4:21
affidavit 27:14,21
affirmative 6:22
afternoon 4:15
agents 27:2
ahead 5:10 22:3
alcohol 26:2,11,23
allegations 10:4 23:8 27:3,7
allegedly 26:12
answers 6:22,24
apologize 25:1
approach 14:15 17:20 19:2
approached 19:1
April 27:15
article 14:20 15:4
aspect 13:14
assaulting 16:19
assist 24:9,18
assistant 22:16 24:16

assuming 17:18
avoid 25:10
aware 22:21 23:5 26:3,9 27:4
awe 17:22

**B**

back 8:24 15:7,8, 21,24 16:3 19:10 22:7
background 25:5, 9
bad 4:14
bailiff 6:3
ball 9:9 11:5 12:1
based 12:17
basically 5:12 8:6 10:7 24:4
basis 23:12 25:13 26:22
basketball 8:2 10:22 11:14
Belfry 7:17,19,20, 22 8:5 12:24 16:13, 17
bench 9:13
birth 5:1
bit 13:13 14:15 19:8,19,20
blends 8:16
Board 12:15 16:10 25:23 26:2,18,20, 21 27:6
Board's 27:2
Bowl 11:7
Boy 15:20
break 7:8,11
Bree 11:1

Brianna 11:2,4
bridge 6:18
briefly 10:12 11:5
bring 15:24
Brittany 11:6
brother 23:20
Buchanan 10:23 11:2,13,19,22

**C**

called 4:3
Cameron 24:5
candid 19:24
Carla 12:7 13:17, 18 16:7 17:2 20:20 21:1,4,5 27:15,20
case 5:18 9:18 10:4,11 12:9,14 16:8 26:6
catch 23:11
Central 7:22 9:2
check 25:6
checking 16:24
checks 25:9
child 27:7
children 26:1
chill 19:3
circumstances 6:16 23:5
class 6:4 9:21 12:7 13:8 14:21 15:12 17:20 19:6 24:5
Classic 15:21
classroom 4:9 12:24 13:21 16:17
coach 4:20 8:1,2,8, 9 14:6 15:3 22:6,

16,21,22 24:1,16 28:2
coached 8:3,6 22:9,23 23:4
coaches 24:9,11, 21,23,24 25:3,11, 12,13
coaching 8:4 15:17 22:16,20 23:6
college 8:22
Comer(ph) 15:3
complaint 25:22
concluded 28:5
connection 10:22 12:18
consecutive 8:15
consoling 19:2
constantly 14:22
content 13:10
context 17:10 18:9 20:8,17
conversation 12:6 21:1 23:19
copy 18:10
county 7:21 11:3,7 25:23
couple 6:7,20
court 6:21
courtroom 6:2
courts 9:15
cover 27:3,6
criminal 13:13 18:1
cross 6:17

## D

**D-E-S-K-I-N-S**
4:19

**D-I-X** 4:22

**date** 5:1

**dated** 27:15

**dates** 8:19

**daughter** 11:6,8
15:18,22 19:9 24:6

**day** 12:9 14:4,8,19
27:23

**declaration** 16:12

**deposition** 5:6,11
28:5

**describe** 14:14

**Deskins** 4:2,19,21
16:16,22 17:3

**detail** 10:20 14:1

**details** 15:14 20:5

**difference** 25:2,4

**direct** 21:1

**discussions** 15:9

**district** 11:22
24:12 25:14,16
27:8

**Dix** 4:22

**Donovan** 4:7
18:11 21:18,20,23
22:1,4 23:21 27:19
28:2

**Dotson** 5:16 9:20

**downstairs** 15:21

**drugs** 26:2,12,22

**duly** 4:4

## E

**early** 13:12 19:6

**easier** 6:23

**eat** 4:16

**education** 7:19
16:10 25:24 27:6

**efforts** 27:2

**employee** 25:24
27:3,5,8

**employees** 24:11
25:16 26:19,20,21
27:2

**end** 9:13

**essentially** 25:23

**event** 24:4

**exact** 8:19

**EXAMINATION**
4:6 23:22 27:11

**Excellent** 6:5

**executed** 16:9

**exhibit** 18:12

**explain** 12:13

## F

**fair** 7:13

**fairly** 18:20

**fear** 16:4

**February** 5:3

**feed** 4:14

**feeding** 4:15

**feel** 19:21 20:15,
16,19

**felt** 14:24 19:12,16

**figure** 25:1

**finish** 6:24 7:10

**finished** 21:19,22,
23

**football** 8:4,5 22:9

**forensics** 13:14

**Fork** 4:22

**forward** 20:4

**found** 12:10 19:6

**fresh** 4:11

**freshman** 13:9

## G

**game** 11:5 12:1

**gave** 16:8 22:11

**general** 19:2

**generalize** 18:15

**geography** 13:9

**girl** 11:16

**girls** 8:2,3

**gist** 10:9 11:9

**give** 5:10

**giving** 6:21

**good** 11:16 18:2

**ground** 14:4,8

**guess** 10:12,19,20,
22,23 12:8,9,17
13:1 14:19 15:2
16:5 19:15,20

**guessing** 8:12

**guilt** 19:13

**guy** 9:14

**guys** 28:4

**gym** 4:11

## H

**happen** 17:8 18:7

**happened** 12:16

**Harrington** 11:1,2,
4

**he'll** 15:24

**head** 6:23

**hear** 15:1,15 20:23

**heard** 10:8 17:3
26:7

**hide** 27:6

**high** 7:17,19,23 8:4
13:1 16:13,17 23:9
25:10

**hired** 24:16

**hog's** 14:4,8

**hold** 21:8,18

**home** 26:1 27:17

**honest** 8:16

**honestly** 14:3,9

**hosted** 25:24

**house** 26:11

**hundred** 17:19

## I

**identification**
18:12

**identified** 26:5,17
27:1

**important** 22:14

**incident** 12:16,23
23:3 26:14 27:16

**incidents** 27:4

**include** 20:18

**independent**

11:24

**information** 14:17
22:14

**instructed** 6:10,17

**intent** 19:22

**intention** 18:15
21:12

**interview** 5:11,21

**introduced** 11:8

## J

**Jerry** 12:15 15:23
16:18 25:24 27:17

**Jerry's** 11:6

**Jim** 10:23 11:2,13,
19,22

**jobs** 8:20

**judge** 6:2

**judgment** 18:19

**jump** 7:1

**jury** 6:2

**justice** 6:4 13:7,12
19:14

## K

**K-E-V-I-N** 4:19

**K.D.** 16:19

**Kendall** 5:16 9:20

**Kentucky** 4:23

**Kevin** 4:2,19 21:15
27:13

**KHSA** 8:14

**kicked** 23:15

**kid** 24:5

**kids** 4:15 14:16,21
15:6 19:2,19 20:23

**kind** 8:22 9:24
10:5,6,7,9 11:7,9,
13,14,15,23 12:12
13:11,14 14:7,21
15:4,9 18:2 19:2,8,
9,10,16 21:2 23:10
24:4

**knew** 11:12 12:15
17:7 18:6 19:7
20:18 23:12

**knowing** 10:2 26:6

**knowledge** 23:14
26:18,19

**Kohari** 22:17,21
23:20

**Kohari's** 23:20

**L**

**lab** 8:24

**law** 6:4 13:7,12
19:14

**lawyer** 5:11

**lawyers** 5:15 6:8

**leaving** 15:22

**lesson** 13:11

**Lexington** 8:23

**liar** 21:5

**limited** 6:16 15:10

**literally** 19:21

**logistics** 22:12
23:12

**long** 8:8

**loop** 14:24

**lot** 6:9,23 15:12,17
18:16 20:6

**Louisville** 21:6

**lying** 20:21 27:20

**M**

**mainstream** 10:6

**make** 6:9

**makes** 5:20

**Mallory** 24:6

**Mark** 22:17

**marked** 18:12

**master's** 9:7,8

**MAT** 9:1

**mattered** 12:14

**means** 6:1

**media** 10:6

**meet** 10:10

**member** 27:5

**mention** 12:13

**mentioned** 22:5
24:24

**met** 10:12 11:5

**middle** 7:23 8:5

**mind** 4:17 19:4

**mindset** 14:15

**minute** 23:24
24:24

**minutes** 7:7

**misconduct** 26:3,
7,18,19,20 27:3

**misinformation**
21:9

**mistaken** 27:22

**mixture** 4:12

**moment** 17:24
19:7 27:19

**months** 27:16,22

**Morgan** 9:8

**morning** 4:10 19:6

**Mountain** 15:20

**moved** 7:23 9:22

**moving** 13:13

**multiple** 15:19

**N**

**named** 22:17

**Neal** 21:18,20

**necessarily** 11:20
14:8 15:14 18:14
22:14 23:7 24:11

**news** 15:4 17:3

**newspaper** 10:7

**normal** 5:20

**notice** 4:4

**noticed** 21:17
27:14

**number** 5:2,3

**O**

**oath** 5:21 16:9

**object** 6:10

**objection** 6:9,13
20:9

**objections** 20:13,
14

**occurred** 16:2
26:14 27:17

**occurring** 18:18

**October** 13:2
16:13 26:15

**oftentimes** 20:24

**opinion** 27:20

**opposed** 19:9

**P**

**p.m.** 28:5

**paid** 24:11 25:3,14

**paper** 10:9 14:20

**parent** 23:2 24:1,
14,21,23,24 25:10

**parents** 24:10

**part** 8:24 9:19
13:15 22:23

**participate** 25:17

**parties** 26:1,3,9

**party** 16:19

**pass** 21:20,21 22:1
27:10

**passing** 11:8

**PCHS** 8:21

**people** 9:15 18:19

**percent** 17:19

**period** 8:11 13:23

**periods** 13:8

**personal** 23:14
26:18

**physical** 4:21

**picture** 10:9 15:4

**piece** 22:13

**Pike** 7:21 9:14 11:7
25:23

**Pikeville** 9:1

**plaintiff** 4:3 5:18
26:6

**Plaintiff's** 25:22

**plans** 13:11

**play** 9:9,16 11:22,
23

**played** 9:16

**player** 10:23

**plied** 26:1,22

**point** 9:14 23:9
24:6 25:12

**positive** 17:19

**possibly** 8:18
14:14

**posted** 10:7

**potentially** 8:17

**prepared** 27:15

**preserve** 20:12

**preserving** 6:13

**pretty** 9:22 18:1

**primer** 5:11

**prior** 8:20 14:7
19:7 22:11,20

**private** 11:20

**process** 20:6

**professional**
24:15

**profiling** 13:13
18:1

**Profit(ph)** 11:16

**program** 9:1 24:10

**programs** 24:19

**promise** 12:21

**psychology** 19:15

**pursuant** 4:3

**Q**

**question** 6:11 7:1,
9 14:10 17:17
20:10 24:8

**questions** 5:14,15
10:18 27:13

**quick** 5:10

quickly 7:15
quote 17:7
quoted 20:16
quoting 17:2

**R**

read 5:9 18:23
ready 21:21
real 8:16,18 9:21
10:14 14:6 22:12
23:8,9 24:2,22
reason 7:7
recall 13:20 14:11
22:15
recently 21:5
recognizing 10:1
recommendation
21:6
record 4:20 5:1
6:14
reflect 16:3
reflected 4:20,24
19:10
regional 11:23
regular 26:22
relate 22:8
released 14:19,20
remember 11:7
12:2 14:1,2,18
15:2,3,6,21 19:1
20:24 23:1
remind 7:5
reporter 6:21
represent 5:16
representative
27:5
restaurants 8:23

Road 4:22
running 12:2 23:2

**S**

safe 20:7
scholarship 21:6
school 7:17,19,23,
24 8:4,5 9:23 11:21
12:15 13:1 15:17,
20 16:14,17 23:9,
13 25:10
schools 11:24
season 8:15
seasons 8:15
Security 5:2,3
semester 13:12
sense 19:18
separate 13:7
sexually 16:19
26:2,12,23 27:7
shaking 6:22
shared 16:9
SHAW 18:10 23:23
she'll 5:5 7:5
shocked 15:16
16:17
show 14:4
showed 15:4
signed 27:15,20
silly 14:10
similar 26:18,20
sir 6:12 7:3,14,18
8:2 9:6,19 10:12
13:19 16:11,15
21:16 25:15 26:10,
13,16,24 27:9,24
sitting 15:23

situation 11:18
16:2 19:10 21:2
Smith 10:10,16
12:4,13,23 20:9
21:15,17,19,22,24
22:3 27:12
soccer 22:24 23:1
24:3
Social 5:1,3
sociology 19:15
softball 8:3,9 14:6
22:6,9 23:4,15
sound 14:10 17:19
18:8,24
speaking 20:13
specifically 8:13
specifics 12:18
spelling 4:17
spend 13:15 18:16
spent 7:22 8:4 9:23
15:16,17
spoken 16:7
sporting 24:4
sports 15:17
staff 22:20 27:5
started 7:9 9:1
16:17
State 9:8
stated 23:24
statement 16:8,9
17:2,14 18:4,10,20
staying 11:11
stick 17:17
stopped 23:6
straight 8:22
student 13:17
16:13

students 14:11
26:22
studied 19:14,15
stuff 15:10,12 18:2
supplied 26:11
supposed 23:13
supposedly 12:11
surprise 18:17
surprised 15:15
18:18
Swafford 11:6
12:16 16:18 25:24
26:4
Swafford's 26:7,
19 27:17
sworn 4:4
Sydney 4:23
system 24:14

**T**

table 6:9 15:22
talk 10:16 12:4,23
14:17
talked 13:12 15:3
talking 14:22 24:6,
18
task 15:7
teach 6:4
teacher 7:17 27:8
teaching 8:21 9:1
12:24 13:6 14:4
17:24
team 22:16 23:15
tech 8:23
testified 4:4
testing 4:10

thing 7:6,16 14:14
things 6:7,20
10:19 11:14 19:20
thinking 8:14
18:16
thought 9:11 16:1
21:19,22
thrilled 4:13
time 4:9,11 5:10
6:8,10 8:11,16
10:8,14 11:11
14:23 15:12,17
17:21 18:16 22:10
24:3,16 28:3
times 15:19 19:11
today 4:9,11 7:7
tough 8:12
track 23:2
trial 20:1
trusting 16:6
18:19
trustworthy 16:5
truth 6:1

**U**

uh-huh 6:23
UK 9:3,4,9,14
undergrad 9:5,6
understand 5:23
6:15 17:13
understanding
9:17 17:22 18:3
upset 17:4

**V**

Vaguely 14:3
volunteer 24:9,10
25:2,13

volunteers 24:18

**W**

wait 6:24

walked 15:1

Walker 12:7 13:17
16:7,12 20:20
27:15

wanted 22:15

week 13:1,21 14:2,
12,18

weekend 16:19
26:15

weeks 10:13,15
13:16

whigged 19:8

wind 23:11

word 5:11 16:17

words 4:13 17:12

worked 8:23

working 20:22

world 13:9

worrying 4:15

written 16:8

wrote 21:6

**Y**

year 7:18,19 13:24
22:10,11

years 7:21,22 8:4,
10 9:23 14:7 25:23

young 15:18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

K.D.,

        Plaintiff,

v.                           Civil Action No.  7:17-cv-132-KKC

JERRY SWAFFORD, in his individual capacity;
THE PIKE COUNTY BOARD OF EDUCATION,
REED ADKINS, in his individual capacity; and
MARK GANNON, in his individual capacity.

        Defendants.

### Sworn Declaration of Carla Walker

1.    My name is Carla Walker. I am 18 years old and live in South Williamson, Kentucky.

2.    In October 2016, I was a student at Belfry High School in Pike County, Kentucky.

3.    I was in Mr. Deskins' classroom at Belfry High School when word started to go around that Jerry Swafford had been accused of sexually assaulting K.D. at a party the previous weekend.

4.    When Mr. Deskins heard the news, he seemed very upset, and said "we all knew something like this was going to happen."

5.    I think what Mr. Deskins meant was that some people who worked at the school had heard about Jerry Swafford's parties and were afraid that a student might get hurt at one of them.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of April, 2018.

*Carla L. Walker*
Carla Walker

