UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE
CIVIL ACTION NO. 7:17-cv-00132-KKC


K.D., by her guardians,
RAYMOND DOTSON and RACHELLE  HAIRSTON          PLAINTIFFS


VS:


JERRY SWAFFORD, in his individual capacity;
THE PIKE COUNTY BOARD OF EDUCATION,
REED ADKINS, in his individual capacity; and
MARK GANNON, in his individual capacity          DEFENDANTS


_____

DEPOSITION OF
WILLIAM THOMAS McCOY
_____


                    The deposition of **WILLIAM THOMAS McCOY**

was taken pursuant to Second Amended Notice To Take Deposition on

Thursday, May 10, 2018, at the Pike County Judicial Center, Jury

Assembly Room, Pikeville, Kentucky.  Said deposition to be used as

evidence for and on behalf of the Defendant, Mark Gannon, at the trial of

this action, and any and all other purposes permitted under the Federal

Rules of Civil Procedure.

Plaintiffs were represented by counsel, Hon. Ryan McCune Donovan, of Bailey Glasser LLP, 209 Capitol Street, Charleston, WV, 25301.

Defendant, Jerry Swafford, was represented by counsel, Hon. Max K. Thompson, of Smith Thompson PLLC, P.O. Box 1079, Pikeville, Kentucky, 41502.

Defendants, Pike County Board of Education and Reed Adkins, were represented by counsel, Hon. Michael A. Owsley, of English Lucas Priest & Owsley, LLP, P.O. Box 770, Bowling Green, Kentucky, 42102-0770; and Hon. Neal Smith, Pike County Board of Education, 316 South Mayo Trail, Pikeville, Kentucky, 41501.

Defendant, Mark Gannon, was represented by counsel, Hon. Jonathan C. Shaw, of Porter Banks, Baldwin & Shaw, PLLC, P.O. Drawer 1767, Paintsville, Kentucky, 41240.

Deponent was represented by counsel, Hon. Nathan D. Brown of Ferrell & Brown, PLLC, 160 East 2nd Avenue, Williamson, West Virginia, 25661.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**WILLIAM THOMAS McCOY,** the witness, after first being duly sworn, was examined and states as follows:

EXAMINATION

By Mr. Shaw

Q1      Mr. McCoy, could you state your full name for the record, please?

A      William Thomas McCoy.

Q2      Mr. McCoy, have you given a deposition before?

A      Yes.

Q3      How many times have you given a deposition before?

A      A lot.

Q4      In what types of situations have you given a deposition in the past?

A.      As a law enforcement officer and as an investigator.

Q5      Have you ever given testimony before on your personal behalf for a personal issue --

A      Yes.

Q6      -- or has it always been in a professional capacity?

A      Personal.

Q7          What types of situations have you given

testimony in in your -- on behalf of yourself as an individual as opposed to

in your professional capacity?

A          It was a car accident.

Q8          How long ago would that have been?

A          2014/15.

Q9          Where would that have occurred at?

A          In Williamson, West Virginia.

Q10          Other than the car accident -- and I assume

that since you gave a deposition that that was a case that went into

litigation?

A          I assume, yes.

Q11          Have you ever been a party to a lawsuit

outside of that action?

A          Not personally, no.

Q12          What about as -- in your professional capacity,

you ever been sued?

A          No.

Q13          Have you ever sued someone?

A          Yes.

Q14          Who?  Who have you sued in the past?

A          It was through my business.

Q15          I mean I -- I mean what?

| A | It was Williamson Memorial Hospital. |
| Q16 | You sued Williamson Memorial Hospital. |
| A | Yes. |
| Q17 | For what? |
| A | Breach of contract. |
| Q18 | And were those for security services? |
| A | Yes. |

MR. SHAW:

Not to be reflected on the record.

(Reporter's Note:

Record stopped briefly resuming

thereafter, as follows:)

| Q19 | How old are you today, sir? |
| A | 42. |
| Q20 | Where do you live? |
| A | South Williamson, Kentucky. |
| Q21 | What's your 911 address? |
| A | 309 4th Street, South Williamson, Kentucky, 41503. |
| Q22 | How long have you lived there? |
| A | Since 2012. |
| Q23 | Where did you live before that? |
| A | Turkey Creek, Kentucky. |

| Q24 | Is that in Pike County? |
|---|---|
| A | Yes. |
| Q25 | Are you from Pike County? |
| A | I've lived here for 20 years. |
| Q26 | Where were you born? |
| A | I's born in South Williamson, Kentucky. |
| Q27 | Have you ever lived -- have you ever resided in |

a state other than the Commonwealth of Kentucky or the State of West

Virginia?

| A | No. |
|---|---|
| Q28 | What's your highest level of education? |
| A | I've got a college degree. |
| Q29 | From where? |
| A | Pikeville College. |
| Q30 | When did you graduate from Pikeville College? |
| A | Criminal Justice. |
| Q31 | When? |
| A | 2009, I believe. |
| Q32 | Did you graduate high school? |
| A | Yes. |
| Q33 | Where'd you graduate high school from? |
| A | Williamson, West Virginia. |
| Q34 | Williamson High School? |

A       Yes.

Q35      What year did you graduate?

A       1994.

Q36      Did you ever attend school in the Pike County

School District?

A       No.

MR. SHAW:

        These are general background questions but --

Q37      Have you ever been in the military?

A       No.

Q38      You ever been convicted of a felony?

A       No.

Q39      Charged with a crime in the last ten years?

A       No.

Q40      You ever testified in Court, Civil Court or

Criminal Court, which I --

A       Yes.

Q41      -- think I understood your testimony earlier is

that you have. Other than suing Williamson Memorial Hospital and the car

accident, have you been involved in any other lawsuits as a -- as a party?

A       No.

Q42      Have you served on jury?

A       Yes.

| | |
|---|---|
| Q43 | State or Federal? |
| A | State. |
| Q44 | What county? |
| A | Mingo County, West Virginia. |
| Q45 | How long ago was that? |
| A | Mid to late 90s, it's been a long time ago. |
| Q46 | Are you married? |
| A | Yes. |
| Q47 | Who are you married to? |
| A | Krista McCoy. |
| Q48 | What's Krista's maiden name? |
| A | Bevins. |
| Q49 | Any children over the age of 18? |

WILLIAM THOMAS McCOY:

| | |
|---|---|
| | Excuse me? |
| Q50 | Any children over the age of 18? |
| A | Yes. |
| Q51 | How many times have you been married? |
| A | Twice. |
| Q52 | Who was your first marriage to? |
| A | Tammy McCoy. |
| Q53 | What was her maiden name? |
| A | Sweeney. |

Q54                          Where was Tammy from?

A                            Williamson, West Virginia.

Q55                          And Christina -- I'm sorry, was it Krista?

A                            Krista.

Q56                          Krista.  Where is Krista from?

A                            Forest Hills, Kentucky.

Q57                          Do you have any children over the age of 18?

A                            I have three.

Q58                          First names and ages, please.

A                            Ashley McCoy, she's 26; Kayla McCoy, she's
24; and Haley McCoy, and she's 19.

Q59                          Where did Haley attend school?

A                            Belfry High School.

Q60                          What year did she graduate?

A                            2017.

Q61                          Where did Kayla attend high school?

A                            She attended Belfry.  She left in her senior
year and graduated in Virginia.

Q62.                         What year would that have been?

A                            Can't remember right off.

Q63                          How about Ashley?

A                            She graduated from Belfry High School.

Q64                          What year would she have graduated?

A                              I'm not sure.

Q65                            Why did your daughter go to Virginia to finish --

A                              She got married.

Q66                            -- school?  Got married, okay.  Your wife,

Krista, do you have any stepchildren over the age of 18?

A                              I have two.

Q67                            What are their first names and ages?

A                              John Bevins.

Q68                            How old is John?

A                              23, 24, I believe; and Joey Stanley.

Q69                            How old is Joey?

A                              22.

Q70                            Did John or Joey -- where did John go to high

school?

A                              He graduated from Belfry.

Q71                            Do you know what year?

A                              I'm not sure.

Q72                            How about Joey?

A                              He graduated from Belfry; and Joey just now

graduated college from Morehead, his graduation's tomorrow.

Q73                            Who were your parents?

A                              Carl and Dorothy McCoy.

Q74                            Are they living?

| | |
|---|---|
| A | My mother is. |
| Q75 | Where did your parents live? |
| A | [No verbal response] |
| Q76 | Where did they live? |
| A | Nolan, West Virginia. |
| Q77 | Did they ever live in Kentucky? |
| A | No. |
| Q78 | What about Krista's parents? |
| A | Her mother lives in Belfry, her father lives in Pikeville. |
| Q79 | What are their names? |
| A | Wally Bevins. |
| Q80 | Are you saying "Blevins" or "Bevins?" |
| A | Bevins; and Mary Phillips. |
| Q81 | What does Wally do for a living? |
| A | He's a retired coalminer. |
| Q82 | What about Mary? |
| A | She's retired President of Community Trust Bank. |
| Q83 | How about Tammy Sweeney, where was she from? |
| A | Williamson, West Virginia. |
| Q84 | Who were her parents? |

A                    Her other is Cathy Pennington, her stepfather

is James Pennington.

Q85                  How about her father?

A                    I never -- never knew her real father.

Q86                  Where do they live?

A                    Hardy, Kentucky.

Q87                  Do you know what Cathy does for a living?

A                    They're both retired.

Q88                  Do you know what they're retired from?

A                    She was a nurse and he retired from the

coalmines.

Q89                  Do you have any brothers and sisters?

A                    Yes.

Q90                  How many brothers and sisters do you have?

A                    I have three brothers and two sisters.

Q91                  Any of them live in Kentucky?

A                    My brother, John Ferguson.

Q92                  Where does he live?

A                    Martin County.

Q93                  What does he do for a living?

A                    He works for the Martin County Board of

Education.

Q94                         Mr. McCoy, it's my understanding you may

have a claim against the Board of Education?

A                           No, sir.

Q95                         You don't?

A                           No, sir.

Q96                         Do you possibly have a claim against any of

the defendants in this action we're here about today --

A                           No, sir.

Q97                         -- Jerry Swafford, Reed Adkins, or Mark

Gannon?

A                           No, sir.

Q98                         Had you considered claims against the Board

of Education?

MR. BROWN:

                            Object to form.  You can answer the question.

WILLIAM THOMAS McCOY:

                            Excuse me?

Q99                         Had you considered claims against the Board

of Education?

A                           Yes.

Q100                        What would the basis of your claim have been?

MR. BROWN:

                            Object to form. You can answer if you know.

A                      They was a rumor that my daughter had an affair with a schoolteacher.

Q101                   To your knowledge, did that just turn out to be a rumor?

A                      I don't have -- I can't answer that; I don't know.

Q102                   Which daughter?

A                      Haley McCoy.

Q103                   Do you know which teacher was identified as possibly having a relationship with your daughter?

A                      Cameron Smith.

Q104                   Would this relationship have been while she was a student or after she had graduated?

MR. BROWN:

                       Object to form.

MR. SHAW:

                       If you know.

A                      I don't know.

Q105                   Do you know what the basis of the rumors were that your daughter had had a relationship with Mr. Smith?

MR. BROWN:

                       Object to form.

A                      It was -- like I said, just a rumor that I was told.

Q106                   When did you first hear about the rumor?

A                              Last summer.

Q107                      So, that would have been the summer of 2017?

A                              Yes, sir.

Q108                      Have you provided any professional services in this case?

A                              No, sir.

Q109                      Just for the record, if you could, tell us a little bit about what your professional background is and what you do for a living.

A                              Worked at Pike County Sheriff's Department; I also worked as an Investigator for the State of West Virginia; I now own a security company and a private investigation business.

Q110                      How long have you owned your own investigation business?

A                              Since 2014.

Q111                      What's the name of that business?

A                              Blue Line Security & Investigations.

Q112                      You were identified by the plaintiff as a witness in this case who had knowledge about Mr. Jerry Swafford's misconduct. What do you know about Jerry Swafford?

A                              I knew that he was a janitor/maintenance guy at Belfry High School.

Q113    There was an incident occurred in October of 2016 at Mr. Swafford's home in Chattaroy, West Virginia.  Are you familiar with that incident?

A    Yes, sir.

Q114    How long have you known Mr. Swafford?

A    I don't know him personally, I just know him from being --

Q115    Just know --

A    -- at the school.

Q116    -- of him?

A    Yes.

Q117    What do you know about any misconduct of Mr. Swafford?

A    I just know what I was told the morning that you asked about in October.

Q118    What were you told?

A    My daughter came home about five o'clock in the morning, I guess round about that time, woke me up; told me that Jerry had raped Kendall Dotson.  I asked her if she had called the police, she told me, no; so, I called the police and I went to Vinson Street in Williamson, West Virginia and located her parents; and her father came and picked her up and took her to the hospital.

Q119                        Now, when your daughter woke you up in October of 2016, was Kendall with her at that time?

A                        Yes.

Q120                        Had the girls came to your house and went to sleep or did they go to your house and wake you up soon as they got there?  Do you know what they -- what they did?

A                        They -- I mean they -- I don't know.  They woke me up; me and my wife both was asleep, I don't know what happened before --

Q121                        Do you know --

A                        -- they woke me up.

Q122                        -- approximately what time that woulda been?

A                        I'm thinking about five o'clock in the morning.

Q123                        If I understood you correctly, you went and got Kendall's father.

A                        Yes.

Q124                        And then, the father came back to your house to pick his daughter up?

A                        I -- I couldn't find Kendall's father; so, I went to Kendall's grandmother's house.  Kendall's grandmother contacted Kendall's father.

Q125                        Was your daughter friends with Jeri Brit Swafford?

WILLIAM THOMAS McCOY:

Is that Jerry's daughter?

MR. SHAW:

Yes.

A          Yes.

Q126          We're talking about Haley, your daughter --

A          Yes.

Q127          -- Haley.  Do you know how long your daughter had been friends with Jeri Brit Swafford?

A          For a little while.  I mean I -- I don't know the kid, she's been to my house a couple times but that's all I know.

Q128          To your knowledge, had your daughter, Haley, attended the party at the Swafford residence the evening before?

A          Yes, I didn't know it was a party; I thought it was a sleepover but, yes, she was there.

Q129          But you knew where she was going.

A          Yes.

Q130          The fact that she was going to the Swafford home, I guess that Saturday night, did that cause you any concern?

A          It didn't.

Q131          Before October of 2016, had you heard anything negative about Jerry Swafford, about "you might not want your daughter to be up there" --

A                              No.

Q132                           -- or "they have wild parties," or "he, you know,

gives kids alcohol, or drugs," anything of that nature?

A                              No, sir; my daughter wouldn't been there if I

had.

Q133                           Well, that's what I was gonna say.  If you had

heard those things, would you have let your daughter go to the Swafford --

A                              No.

Q134                           -- home?  The morning that your daughter

woke you up, did you try to interact with or check on Kendall Dotson?

A                              I asked her if she had been to the hospital and

she told me that she had, and that they refused to treat her; and I told her

to go lay in Haley's bed, I's gonna go find her -- find her family.

Q135                           Based upon your experience as a police officer

and your training, did she appear to be under the influence of anything?

MR. DONOVAN:

                               Object to form.

A                              She was just very distraught.  She was very

upset, crying. My concern was finding her family.

Q136                           Did she appear to be intoxicated?

MR. BROWN:

                               Object to the form.

A                              I -- that wasn't a concern.  I didn't --.

Q137                    Did your daughter appear to be intoxicated?

A                       No.

MR. BROWN:

                        Object to the form.

Q138                    Was there anyone else with your daughter and

Kendall Dotson that morning?

A                       There was several girls there.

Q139                    There were?  Did you know the girls?

A                       One of them was a Perkins girl and they's

another girl there but I don't know her name.

Q140                    Did your daughter tell you what had

happened?

A                       She told me that she had left to go to another

friend's house because they was drinking; and when she returned, she

walked by the bedroom and she seen Jerry Swafford on top of Kendall.

Q141                    Did she tell you what happened after that?

A                       She said that she went in the room, got Kendall

up and brought Kendall outta the house.

Q142                    Did she tell you if Kendall was able to walk on

her own or if she had to be carried or --

A                       She didn't say.

Q143                    Have you had any conversations with Cindy

Anderson about this event?

A                                  Yes.

Q144                    What types of conversations would you have had with Miss Anderson?

A                                  She basically just called and asked me if we would consider becoming a part of a lawsuit and I told her, no.

Q145                    Did she tell you what the basis of the lawsuit was that she wanted you to become a part of -- party to?

A                                  She said that her daughter had had issues with Jerry Swafford at the school and the school failed to act on her complaints.

Q146                    Did she tell you what type of issues that her daughter had had?

A                                  I didn't go into it with her.

Q147                    Did she mention anything to you about knowing that the party was going to occur or any steps that she took to try to stop the party or anything of that nature?

A                                  She mentioned to me that she went to the school on Friday to complain about something but I didn't ask her what it was.

Q148                    There's been an allegation in this case that there's been a pattern of I guess misconduct by school employees, and in particular employees that worked at Belfry High School. Do you know anything about that?

A                                Just rumors, nothing that I can substantiate.

Q149                            Like what -- what types of rumors, are there certain individuals or --?

A                                I mean, I'm not -- I don't feel comfortable testifying to rumors.

Q150                            Do you know whether or not some of the information that you heard through rumor, I guess, served as a basis of plaintiffs' complaint in this action?

A                                Yes.

Q151                            Which one of those rumors, if you could, served as the basis of the complaint in this action, to your knowledge?

A                                I mean like I said, basically, just that there was complaints come into the school and the school didn't act on them.

Q152                            What type of complaints?

A                                Like, you know, I don't -- I don't wanna testify to rumors 'cause it's nothing I can substantiate.

MR. SHAW:

                                Let's go off the record for just a second.

(Reporter's Note:

                                Record stopped briefly resuming

                                thereafter, as follows:)

Q153            Mr. McCoy, you testified you heard rumors that you hadn't been able to substantiate and that you'd relayed some of those rumors to plaintiffs' counsel in this case; is that accurate?

A            I -- I don't -- I don't know.

MR. BROWN:

            Object to form.  I don't think in his line of testimony.

MR. SHAW:

            Well, he testified that all that he knew were rumors and he testified that he knew those rumors formed the basis of some of the allegations in the Complaint.

MR. BROWN:

            I don't disagree with that.  Maybe I didn't hear you correctly.  I thought you said he relayed those to plaintiffs' counsel is your question just now.

MR. SHAW:

            Well, I may have.

Q154            Do you know how plaintiffs' counsel, I guess, obtained that information?

A            No.

Q155            Did you tell plaintiffs' counsel that information?

A       I'm not sure which information you're ta' --

you're -- I mean I was asked questions, I answered it --

Q156     I mean --

A       -- if I heard this, if I heard that; but I mean I

don't know exactly what you're talking about, so --.

Q157     But you were asked questions by plaintiffs'

counsel, that's the question.

A       Yes.

Q158     Now, the rumors that you had heard -- and I

don't wanna get into -- I understand you don't wanna --

A       Right.

Q159     -- slander anybody or get anything on the

record without any basis in fact; but did the rumors concern Jerry Swafford

or did they concern other employees of the Pike County Board of

Education?

A       Probably former employees of Belfry High

School.

Q160     Former employees?

A       Yes.

Q161     I think you already testified that if you'd known

anything about Swafford or thought anything bad about him, your daughter

wouldn't have been up there, correct?

A       Correct.

Q162　　　　　　These rumors that you shared with plaintiffs' counsel, did you at any time share any of those rumors with Mark Gannon?

A　　　　　　Not that I can recall.

Q163　　　　　　How about Reed Adkins?

A　　　　　　I've never spoke to Reed Adkins.

Q164　　　　　　The rumors, would you have shared any of those rumors with any of the administration, Belfry High School and Pike County Board of Education?

A　　　　　　I don't know if this is what you're asking or not but I'm gonna answer it anyway.  I had a conversation with Mark Gannon the morning after this happened 'cause I didn't know what was gonna happen on Jerry Swafford and I didn't want any backlash going to my child by Jerry.  I did not know they was gonna suspend Jerry and he wouldn't be there.

Q165　　　　　　You're talking about the morning after the --

A　　　　　　Right.

Q166　　　　　　-- the party?  Did you talk to him on Sunday or did you talk to him on --

A　　　　　　Monday morning.

Q167　　　　　　-- Monday?  Monday morning.  So, after the incident, you talked to Gannon on Monday morning --

A　　　　　　Yes.

Q168                    -- and do you recall anything about that

conversation, about what was said or --

A                       I told Mr. Gannon what I'd heard and that I did

not want Jerry harassing Haley at school.

Q169                    What did Mr. Gannon tell you?

A                       He told me that Jerry had been suspended and

Jerry would not be on the property.

Q170                    Had you had any other conversations with Mr.

Gannon?

A                       Not that I can recall.

Q171                    Now, you testified that your other daughters --

let's see; that Ashley, went to Belfry; that Kayla went to Belfry but

graduated in Virginia --

A                       Yes.

Q172                    -- from high school.  Did they have any

problems or issues with Mr. Swafford when they attended Belfry High

School?

A                       Not that I know of.

Q173                    Did they have any issues or problems with any

of the staff at Belfry High School when they attended school there?

A                       No.

Q174                    How about your stepsons, John and Joey?

A                       No.

Q175                    Did you ever have any conversations with Mr. Swafford about what happened?

A                    No.

MR. SHAW:

Pass the witness.


MR. OWSLEY:

Mr. McCoy, my name's Mike Owsley. I think we met briefly when you were in for that short deposition earlier. I just have, really, a few followup questions.

EXAMINATION

By Mr. Owsley

Q1                    Other than the conversation you had with Mark Gannon on Monday, which I believe would've been the 17th of October, 2016, did you ever speak to anyone on the Board of Education of Pike County or any administrator, including but not limited to the superintendent and the principal, about Jerry Swafford?

A                    I've never spoken to anybody on the Board of Education level. I was at the school quite frequently 'cause my daughter was there. I don't know if anything was said in passing, I mean Mr. Gannon 'cause, you know, I've knowed him for years; but to sit down and have a conversation with him concerning this after that, I can't recall.

Q2                        Prior to October 15, 2016, which was the date

of the party at Mr. Swafford's home, did you ever report to any

administrator in the Pike County School District any concerns you had

about any teacher or other employee?

A                        No, sir.

MR. OWSLEY:

                        That's all I have.

MR. THOMPSON:

                        I don't have any questions.


                        EXAMINATION

                        By Mr. Donovan

Q1                        Billy, I believe you testified, and correct me if

I'm mischaracterizing your answer, that Haley told you she left the party

because she had been drinking and then came back.

A                        No, she left because other people was

drinking.

Q2                        Knowing what you know now, after the fact,

and how kids sometimes gloss over things with their parents, do you think

Haley was drinking at that party?

A                        Not to my knowledge.

Q3                        Have you asked her?

A                        No.

Q4                Had Haley been to Jerry Swafford's home before that night, as far as you were aware?

A.              I believe so.

Q5                Do you have any idea how many times?

A               No.

Q6                I believe you testified that you trusted Haley to go to -- you thought it was okay for Haley to go to Jerry's house.

A               Correct.

Q7                Is that right?  What was the basis of your trust in Jerry Swafford?

A               Just that he worked for the -- he -- he was a school employee.

Q8                Why did that make you trust him?

A               I grew up when you -- you trust teachers.

Q9                Is it your understanding that in order to work for the Board of Education, you know, there has to be some kind of background run?

A               Correct.

Q10              And that a Board has some kind of obligation not to employ people who would be dangerous to have around children.

A               I would believe so, yes.

Q11              So, is that part of the reason you trusted sending your daughter to Jerry Swafford's house?

A                              Yes.

MR. DONOVAN:

                               That's all I got.

MR. SHAW:

                               I have a few followup.

                               RE-EXAMINATION

                               By Mr. Shaw

Q1                             Are you aware of anything in Jerry Swafford's
background that would make him subject to scrutiny or unemployability
(sic) in a school?

A                              No, sir.

Q2                             And I'm not -- I'm talking about before --

A                              Right.

Q3                             -- October 2016. You were asked about if you
had reported anything to school administrators.  To your knowledge, have
any of your family, are you aware of anyone firsthand other than Cindy
Anderson who reported concerns to anyone at the school level?

A                              No, sir.

MR. SHAW:

                               Pass the witness.


MR. OWSLEY:

                               Just really briefly, sir.

RE-EXAMINATION

By Mr. Owsley

Q1                                I think you said that, in response to all the questions, that Haley had indicated to you that she left the party and went somewhere else because others were drinking.

A                                Correct.

Q2                                Did she tell you where she went?

A                                Walmart parking lot.

Q3                                Did she tell you how long she was gone before she returned to the party?

A                                She didn't.

Q4                                Did she tell you what time she saw Jerry Swafford on top of Kendall Dotson?

A                                She did not.

Q5                                Did I understand your testimony that she got Kendall out of the bed and out of the house?

A                                Correct.

Q6                                Did you have any understanding whether she did that alone or was assisted by anyone?

A                                I'm not sure.

Q7                                Did she tell you anything about Kendall's state of sobriety at that time?

A                                She said she was out of it.

Q8                     Am I correct that it was your understanding that Kendall -- I'm sorry -- that Kayleigh and Summer Perkins, and perhaps some other person you didn't know, took Kendall to the hospital?

A                      Correct.

Q9                     And was that the hospital in Kentucky?

A                      Yes, sir.

Q10                    Kendall advised you that she would -- they would not treat her there.

A                      Well, that's what my daughter advised me.

Q11                    I'm sorry; your daughter told you that Kendall -- they wouldn't treat Kendall.

A                      They told her they couldn't treat 'cause she was underage and didn't have a parent with her.

Q12                    So, when they brought her to your house and you then left to go try to find her family --

A                      Correct.

Q13                    -- who was left at your home at that time?

A                      I think Haley, the other kids, and probably my stepson, Joey.

Q14                    And your wife?

A                      My wife was with me.

Q15                    So, Kendall, Haley, maybe Summer Perkins --

A                      Yes.

Q16                          -- and the girl who you can't remember --

A                            Yes.

Q17                          -- don't know her name --

A                            Yes.

Q18                          -- and perhaps your stepson.

A                            Yes.

Q19                          How long do you think you were gone looking
for Kendall's family?

A                            30 minutes.

Q20                          When you returned home, do you have some
idea what time that would've been?

A                            It was just getting daylight, so, early.

Q21                          Did Kendall's father then come to your house
and pick up Kendall?

A                            Yes.

Q22                          Do you have some idea what time that
would've been?

A                            He was actually pulling in when I got outta my
car.

Q23                          Just about daylight then.

A                            Yes.

MR. OWSLEY:

                             Thank you, that's all the questions I have.

MR. DONOVAN:

I do just have a couple more.

RE-EXAMINATION

By Mr. Donovan

Q1     You said you had a conversation with Mark
Gannon on Monday?

A     Yes, sir.

Q2     Can you tell me a little bit about that?  Did you
schedule that meeting?

A     No, I just came in and said I need to speak to
him.

Q3     And that was on Monday --

A     Monday morning.

Q4     -- morning?  Where did you meet him?

A     In his office.

Q5     Was he alone?

A     No.

Q6     Who else was there?

A     Mr. Varney and Mr. Thompson.

Q7     Who is Mr. Varney?

A     He is assistant principal.

Q8     It's a different Mr. -- is that a different Mr.
Varney than that was once the principal?

A                           Yes.

Q9                          And you said Mr. Thompson?

A                           Yes.

Q10                         Who is that?

A                           He's also an assistant principal, basketball coach.

Q11                         What did you -- why did you wanna have that meeting?

A                           Because I was -- I was concerned that Jerry would come to school and maybe say or do something to my daughter.

Q12                         Why would he have said or done something to your daughter?

A                           Just because of what had happened the night before and Haley was a witness to it.

Q13                         What did you tell Mr. Gannon or Principal Gannon?

A                           Same thing that I -- I said here.  What I was told that happened, the police was investigating it and I did not -- I didn't want him coming into school and having any contact with Haley.

Q14                         What was Principal Gannon's response to that?

A                           He told me that he had been made aware of it just a little earlier and that he had suspended Jerry.

Q15                He had been made aware of the --

A                Accusations.

Q16                -- incident?

A                Yes.

Q17                Did Mr. Gannon say anything to you in that conversation about having been aware of the partying events?

A                No.

Q18                Did he mention anything about receiving a call from Cindy Anderson?

A                Not that I can remember.

Q19                At that time, when you had that conversation with Principal Gannon, were you aware that Cindy Anderson had warned him in advance?

A                She had contacted me.  I can't remember if it was before or after that -- that meeting.  Been two years ago.

Q20                You didn't raise it.

A                No.

Q21                Was that the extent of the conversation?

A                Yes.

Q22                So, you told him you were concerned that there may be some retaliation --

A                Correct.

Q23                -- and he told you, what?

A                    He told me that Jerry would not be at school that day; that he had been suspended; and that I did not have to worry about Jerry saying or doing anything to Haley if he did return.

Q24                  Did he tell you why Jerry had been suspended?

A                    Just because he had been made aware of the accusations.

Q25                  So, is it your understanding that Mr. Gannon was the one who handed down the suspension or the Board?

A                    I don't know.  He just told me the outcome.

Q26                  Did Mr. Gannon seem surprised by this?

MR. SHAW:

                     Objection.

MR. DONOVAN:

                     You can answer.

A                    I think he -- I mean I can't testify to his -- I don't think it was expected.

Q27                  I'm not asking you to testify to his emotions; I'm asking you to testify how you perceived them.  Did he seem surprised to you?

A                    I think it was unexpected to him, for the allegations.

Q28                    But he didn't say anything about knowing about
anything.

A                      No.

Q29                    Did anyone else there say anything about
knowing about it in advance?

A                      No.

Q30                    Are you aware that Principal Gannon has since
that time admitted that Cindy Anderson did call him on that Friday?

A                      I have no knowledge.

Q31                    Knowing that, does it surprise you that he didn't
say anything to you about it at the time?

A                      No, 'cause I wouldn't want him discussing my
conversation with another parent.

Q32                    Let me ask you another question.  Your
daughter was a classmate of Kendall Dotson, is that right?

A                      I believe so, yes.

Q33                    If you had known about -- about -- if someone
had called you the night before this party and told you what was gonna
happen, how would you have responded?

A                      I wouldn't have let my daughter go.

Q34                    Would you have taken any other actions?

A                      No.

Q35                    None?

A                      No, sir.

Q36             You wouldn't have reported it to the school?

A                      No.

Q37             You wouldn't have reported it to the police?

A                      I would have no reason to.

Q38             If you knew that a -- that an adult was gonna have a party and invite a bunch of children and give them alcohol, you wouldn't have reported that to anybody?

A                      That's a different question; and, yes, I probably would've called somebody.

MR. SHAW:

                      Object, leading.

Q39             Do you know if Principal Gannon took any action after receiving that call from Cindy Anderson?

A                      Not that I'm aware of.

Q40             Do you think he should have?

A                      I can't speak to that.

Q41             Again, I'm just asking what you think.  Do you think that the principal should've taken some kind of action?

MR. SMITH:

                      Asked and answered; he's already answered the question.

MR. DONOVAN:

> He can answer.

MR. SMITH:

> He already has.

MR. DONOVAN:

> He can answer.

A     I don't know what their policy is.

Q42    You think it would depend on what the policy said?

A     Correct.

MR. DONOVAN:

> That's all I got.


MR. SHAW:

> A few more.
>
> FURTHER EXAMINATION
>
> By Mr. Shaw

Q1     How far is your home from the Swafford home?

A     It's in a different state but probably six miles.

Q2     Had you been to the Swafford home before?

A     No, sir.

Q3     Now, you testified a few seconds ago or a few moments ago that Cindy Anderson --

A                        Let --

MR. SHAW:

                         I'm sorry, go ahead.

A                        Let me re-answer.  I did go to the Swafford

home after.  I thought you's asking me before this incident.

Q4                       You went to the Swafford home after the

incident?

A                        Yes.

Q5                       When did you go to the Swafford home?

A                        The morning of the incident.

Q6                       Why did you go to the Swafford home that

morning?

A                        'Cause one of the girls had told me they left

their shoes on his back porch and I -- they did not wanna go after them;

and I said, "Well."  Once we got everybody squared away and needed to

be where they needed to be, I drove down there to see if I could see her

shoes on the back porch.

Q7                       Were you able to retrieve her shoes?

A                        No, sir.

Q8                       Who was it that had lost their shoes?

A                        It was one of the girls, I can't remember which

one.

Q9          You mentioned that Cindy Anderson had called you maybe before or right after this incident.  What was the context of that call?  Why was she calling you?

A          She basically told me that her daughter had had some problems and wanted to know if -- if we was in any -- had any interest in joining a lawsuit with her and I told her, no.

Q10          So, that's the conversation you were referring to with plaintiffs' counsel a few moments ago.

WILLIAM THOMAS McCOY:

          With Cindy Anderson?

MR. SHAW:

          Yes.

A          Yes.

MR. SHAW:

          Pass the witness.

          (DEPOSITION CONCLUDED)

STATE OF KENTUCKY

COUNTY OF PIKE


I, Shirley S. Hensley, Notary Public in and for the State of Kentucky at Large, whose commission as such will expire March 25, 2021, do hereby certify that the foregoing deposition of **WILLIAM THOMAS McCOY** was taken at the time, place, and for the purposes stated in the caption hereto.

I further certify that said taking was pursuant to Second Amended Notice To Take Deposition; that appearances were as stated in said caption; that the witness was first duly sworn by me before testifying; that said testimony was taken by me in shorthand notes and by tape-recording and later reduced to typewritten material herein, which is a true, full, complete and accurate transcript thereof; that the parties did not request the reading and signing of the deposition of said witness.

IN TESTIMONY WHEREOF, I have hereunto set my hand at Pikeville, Kentucky, this 24th day of May, 2018.

_____

SHIRLEY S. HENSLEY, REPORTER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE
CIVIL ACTION NO. 7:17-cv-00132-KKC


K.D., by her guardians,
RAYMOND DOTSON and RACHELLE  HAIRSTON                    PLAINTIFFS


VS:


JERRY SWAFFORD, in his individual capacity;
THE PIKE COUNTY BOARD OF EDUCATION,
REED ADKINS, in his individual capacity; and
MARK GANNON, in his individual capacity                    DEFENDANTS


I N D E X

_____
Name of                                                        Page
Witness:  WILLIAM THOMAS McCOY                                 Number

Caption and Appearances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1 - 2

EXAMINATION
  By Mr. Shaw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3 - 27

EXAMINATION
  By Mr. Owsley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27 - 28

EXAMINATION
  By Mr. Donovan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28 - 29

RE- EXAMINATION
  By Mr. Shaw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

RE-EXAMINATION
  By Mr. Owsley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31 - 33

(continued)

INDEX (continued)

RE-EXAMINATION
  By Mr. Donovan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34 - 40

FURTHER EXAMINATION
  By Mr. Shaw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     40 - 42

Reporter's Certificate. . . . . . . . . . . . . . . . . . . . . . . . . . . . .       43