```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF KENTUCKY
 2                SOUTHERN DIVISION at PIKEVILLE
                  CIVIL ACTION NO. 7:17-cv-00132-KKC
 3

 4   * * * * * * * * * * * * * * * * * * * * * * * *

 5   K.D., by her guardians
     RAYMOND DOTSON AND RACHELLE HAIRSTON,
 6
                  Plaintiffs,
 7
     vs.
 8
     JERRY SWAFFORD, in his individual capacity;
 9   THE PIKE COUNTY BOARD OF EDUCATION,
     REED ADKINS, in his individual capacity;
10   and MARK GANNON, in his individual capacity,

11                Defendants.

12   * * * * * * * * * * * * * * * * * * * * * * * *

13

14
                  Deposition of Rachelle Hairston taken by the
15   Defendants under the Federal Rules of Civil Procedure
     in the above-entitled action, pursuant to notice,
16   before Angela L. Curtis, a Certified Court Reporter, at
     Bailey & Glasser, 209 Capitol Street, Charleston, West
17   Virginia, on the 9th day of May 2018.

18

19                REALTIME REPORTERS, LLC
                  ANGELA L. CURTIS, CCR
20                   713 Lee Street
                  Charleston, WV  25301
21                   (304) 344-8463
                  realtimereporters.net
22

23

24
```

```
 1                    APPEARANCES:

 2

   APPEARING FOR THE PLAINTIFFS:
 3
           Ryan Donovan, Esquire
 4         BAILEY & GLASSER
           209 Capitol Street
 5         Charleston, WV  25301

 6
   APPEARING FOR THE DEFENDANT
 7 MARK GANNON:

 8         Jonathan C. Shaw, Esquire
           PORTER, BANKS, BALDWIN & SHAW, PLLC
 9         327 Main Street
           Post Office Drawer 1767
10         Paintsville, KY  41240-1767

11
   APPEARING FOR THE DEFENDANT
12 PIKE COUNTY BOARD OF EDUCATION:

13         Michael A. Owsley, Esquire
           ENGLISH, LUCAS, PRIEST & OWSLEY, LLP
14         1101 College Street
           Post Office Box 770
15         Bowling Green, KY  42102-0770

16         Neal Smith, Esquire
           316 South Mayo Trail
17         Pikeville, KY  41501

18
   APPEARING FOR THE DEFENDANT
19 JERRY SWAFFORD:

20         Max Thompson, Esquire
           SMITH THOMPSON, PLLC
21         Post Office Box 1079
           Pikeville, KY  41502
22

23

24
```

1          EXAMINATION INDEX

2  BY MR. SHAW . . . . . . . . . . . . . . . 4

3  BY MR. OWSLEY . . . . . . . . . . . . . .12

4  RE BY MR. SHAW. . . . . . . . . . . . . .16

5  BY MR. DONOVAN. . . . . . . . . . . . . .17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1            R A C H E L L E     H A I R S T O N

2   was called as a witness by the Plaintiff, pursuant to

3   notice, and having been first duly sworn, testified as

4   follows:

5

                         EXAMINATION

6   BY MR. SHAW:

7       Q.   Could you state your full name for the record

8   please?

9       A.   My name is Rachelle Yvette Hairston.

10      Q.   And, Ms. Hairston, where are you currently

11  located?

12      A.   Qatar.

13      Q.   And is this a military base in Qatar?

14      A.   Yes, sir.

15      Q.   Okay, and how long have you been deployed to

16  Qatar?

17      A.   Since I got here February the 5th.

18      Q.   And do you know how long you will be in Qatar?

19      A.   I could be up to nine months.

20      Q.   Okay.   Not to be reflected on the record, what

21  is your Social Security number?

22      A.   Do I have to answer my Social Security number

23  over the phone?

24           MR. DONOVAN:   It won't be -- it won't be

1  on the record.  It will remain confidential.  It won't

2  be recorded anywhere.

3      A.  ***-**-****.

4      Q.  I'm sorry, could you repeat that please?

5      A.  ***-**-****.

6      Q.  Okay, and also not to be reflected on the

7  record, what is your date of birth?

8      A.  *** **th, ****.

9      Q.  How old are you today?

10      A.  I am 45 years old.

11      Q.  What is your highest level of education?

12      A.  I have a master's degree in contract

13  management.

14      Q.  And where is that through?

15      A.  University of Management and Technology.

16  University of Management and Technology.

17      Q.  Perfect.  That sounds a lot better.  Okay.

18  When did you receive your master's?

19      A.  I received my master's in 2016, February.

20      Q.  What other degrees do you hold?

21      A.  I have a bachelor's degree and I got that from

22  TUI in 2011 and I have an associate's degree.  I got

23  that in 2004 from -- I'm not for sure.  The college is

24  in South Carolina.

1    Q.   And how long have you been?

2    A.   Midland State.  It's Midland State.

3    Q.   And how long have you been in the military?

4    A.   I've been in the military 23 and a half years.

5    Q.   And currently what is your job in the

6  military?

7    A.   I'm a Battalion Star Major.

8    Q.   Where did you attend high school?

9    A.   I attended Williamson High School.

10    Q.   And what year did you graduate?

11    A.   1990.

12    Q.   Have you ever testified before?

13    A.   No, sir.

14    Q.   Have you ever sued or been sued outside of

15  this action?

16    A.   No, sir.  I, well, when I had a car wreck, the

17  insurance gave me some money.  I'm not sure if that

18  counts as a suit.  I'm not for sure.

19    Q.   So you don't know if you had to file suit and

20  that action was settled with the insurance company or

21  the insurance company just went ahead and paid?

22    A.   I'm not for sure how it was.  I just know they

23  paid me a small check.

24    Q.   Did you have an attorney that worked with you?

1     A.   Yes.

2     Q.   Who was your attorney?

3     A.   I have no idea.

4     Q.   Okay.  Where did the accident occur?

5     A.   In Florida.

6     Q.   Okay.  Have you ever served on a jury?

7     A.   No.

8     Q.   Okay.  We took Mr. Dotson's deposition a few

9  weeks ago, and it's my understanding that during the

10 time period that's relevant for this case that you were

11 deployed and not home; is that correct?

12    A.   Not really.  I think I had just been back in

13 the states for like a week.

14    Q.   Okay.  When were you back in the states?

15    A.   I got back October the 7th, 2016.

16    Q.   Okay.  And then when did you leave?

17    A.   I left September -- oh, I'm sorry, I left

18 October 2015.

19    Q.   Okay.  You returned home October the 7th,

20 2016?

21    A.   Yes, and I deployed October 2015 so I was gone

22 for a year.

23    Q.   Okay.  When did you leave again after your

24 return October 7th, 2016?

1      A.  I'm confused.  What do you mean when I did I

2  leave again?  To come here?

3      Q.  Is that where you went next?

4      A.  Oh, no, I'm sorry.  I was at Fort Durham, New

5  York.  I'm sorry, I didn't understand the question.

6      Q.  So in October of 2016 would you have been in

7  Fort Durham, New York?

8      A.  Yes, sir.

9      Q.  Okay.  During October of 2016, would you have

10 been in West Virginia?

11     A.  I don't think I came there until the end of

12 October.

13     Q.  Okay.  So during the relevant time period in

14 this case, you were not in the State of West Virginia

15 or in the State or the Commonwealth of Kentucky?

16     A.  No, sir.

17     Q.  Okay.  Do you have any knowledge of when your

18 daughter first started associating with the Swafford

19 family?

20     A.  Yes, sir.  She said she seen him at school on

21 occasions and I think her and his daughter were

22 associates.  They weren't like best friends or

23 anything, but she invited her to a party.

24     Q.  And is it your understanding that October the

1  15th, 2016, was the first time that your daughter had

2  been to the Swafford home?

3      A.  Yes, sir, it is.

4      Q.  Okay.  Before October the 15th, 2016, did you

5  know Jerry Swafford?

6      A.  No, sir.

7      Q.  Before October the 15th, 2016, had you had any

8  concerns with or had any issues with the Pike County

9  Board of Education or the administration at Belfry High

10  School?

11     A.  No, sir.

12     Q.  Okay.  Before October the 15th, 2016, had you

13  ever spoken to Mr. Mark Gannon?

14     A.  I think I did, sir.  I think when I was

15  registering her for school I came up there and I talked

16  to him.

17     Q.  Okay.

18     A.  I'm not for sure.  No, it wasn't him.  I'm

19  sorry.  I did talk to him one day, but it was the coach

20  that gave me the paperwork and then I think I turned it

21  into Mr. Gannon or somebody.

22     Q.  Okay.  What type of discussions would you have

23  had with Mr. Gannon?

24     A.  Nothing really.  I was just was saying that I

1  was in the military and she was staying there with

2  Raymond.

3     Q.  Did you ever have any conversations with Reed

4  Adkins?

5     A.  I don't even know who that is, sir.

6     Q.  Okay.  Okay.  When did you first become aware

7  of any incident at the Swafford home?

8     A.  The next day, sir, so it would be October

9  16th.

10     Q.  Okay.  What did you hear and who did you hear

11  it from?

12     A.  My mom and I heard my daughter had been raped.

13     Q.  Have you seen the results of any of the

14  medical exams that were performed on your daughter the

15  morning of October the 16th?

16     A.  Yes, sir, I have.

17     Q.  Okay.  Do you believe that your daughter was

18  raped?

19     A.  I believe she was sexually assaulted, yes.  I

20  don't know if he penetrated her, but I believe he did

21  something.

22     Q.  And that's why he's in jail currently, is that

23  your understanding?

24     A.  Yes, sir.

1    Q.   The alcohol consumed by your daughter the

2  evening of October the 15th, do you know where that

3  alcohol came from?

4    A.   You broke up, sir, I didn't hear that whole

5  question.

6    Q.   Your daughter had consumed, I guess, quite a

7  bit of alcohol on the evening of October the 15th?

8              MR. DONOVAN:   Object to the form.

9    A.   She told me that she only had maybe one or two

10  drinks.  Now when she took that second drink, she

11  passed out.

12    Q.   Okay.  Did she tell you where she got the

13  alcohol?

14    A.   I think she said her cousin had bought it.

15    Q.   Okay.  Her cousin had bought her a bottle of

16  vodka, is that your understanding?

17    A.   Yes, it is.

18    Q.   Okay.  All right.  The -- do you know any

19  first-hand facts about this case other than what you

20  may have heard from family members or others?

21    A.   No, sir.

22    Q.   Okay.  And the information that you have about

23  this case, who were the key individuals that you would

24  have obtained your information from?

1    A.  My daughter K█████.

2    Q.  Okay.

3            MR. SHAW:  I will pass the witness.

4            MR. OWSLEY :  Could I have just a minute?

5            MR. DONOVAN:  Just a second, Rachelle.  I

6    told you this wouldn't be very long and I think we're

7    actually going to keep our promise maybe, so just a

8    moment.

9            THE WITNESS:  Okay.

10           MR. DONOVAN:  Okay.  Mr. Owsley's going

11   to ask you a few questions now.

12                    EXAMINATION

13   BY MR. OWSLEY:

14    Q.  I know it's late for you at night so I'll try

15   to be brief for you, ma'am.

16    A.  Okay.  Thank you, sir.

17    Q.  I, along with Mr. Smith, represent the

18   superintendent of schools and the school board and I

19   just have a couple of questions.  You said you did not

20   know who Mr. Adkins was.  Reed Adkins is the

21   Superintendent of the Pike County Board of Education.

22   Would I be correct that you not only do not know who he

23   is, you had no communication with him at any time?

24    A.  No, sir, I never had any communication with

```
 1  him at any time and I do not know who he is.
 2      Q.  Would I also be correct that you have not had
 3  any communication at any time with any member of the
 4  Pike County Board of Education?
 5      A.  No, sir, I have not.
 6      Q.  And I would I be correct that you've not had
 7  any conversation with any other administrator in the
 8  Pike County School District?
 9      A.  No, sir, I have not.
10      Q.  You indicated that your mother had told you
11  about the incident.  Did she call you the morning of
12  Sunday, October 16th?
13      A.  Yes, sir, she did.
14      Q.  And was she the one who told you that she
15  understood that K███████ had been raped?
16      A.  Yes, sir.
17      Q.  What did your mother tell you when she called?
18      A.  You need to come home, your daughter's been
19  raped.
20      Q.  Okay.  And did you come home then?
21      A.  No, sir, I did not.
22      Q.  Is that because of your station and your
23  position you weren't able to?
24      A.  No, because when I talked to K██████at first
```

```
 1   she did not think that the man had did anything to her,
 2   but after she found out that he admitted he did, then
 3   she was very distraught and I felt, as a mother, that I
 4   should come home to my child.  But I guess in the same
 5   sentence I could say that it was because it's my job
 6   because we're not supposed to go anywhere for two weeks
 7   after we redeploy.
 8        Q.  So you did not come home for those reasons; is
 9   that right?
10        A.  Yes, sir.  I probably would have came -- I
11   probably would have tried to kill the man, so it's
12   probably best I didn't go.
13        Q.  I understand that K█████ is in her second
14   semester, just finishing her second semester Eastern
15   Kentucky University.  Is that your understanding as
16   well?
17        A.  It is true, sir.
18        Q.  She's doing well as far as I can determine.
19   Is that your understanding as well?
20        A.  She's doing okay.  I'm not going to say she's
21   doing well because she's a better student.
22        Q.  You're saying she could do better?
23        A.  Yes, sir.
24        Q.  Okay.  Do you know when you will be back in
```

```
 1   this area in the future?
 2       A.  I can stay here up to nine months.  It
 3   depends.  I could come home in August or I can stay
 4   until November.  I won't know until my orders are
 5   published.
 6       Q.  And during the time that you have been
 7   deployed most recently, I understand that K█████ has
 8   stayed with her father; is that correct?  Up until she
 9   went to college?
10       A.  Yes, sir.  No, I was actually home so she came
11   back and forth.  I was home when she started school.
12       Q.  Oh, okay.  So you were actually back here when
13   she was starting school at Eastern Kentucky?
14       A.  Yes, sir.  So she did stay with her dad, but
15   then when she was at school she would come back and
16   forth.  She would go to my house, because I was in
17   Kentucky by then, and she would go to her dad's house
18   in West Virginia.  I was at Fort Campbell by then.
19       Q.  So is my understanding correct that when you
20   initially talked to K█████ after this incident in
21   mid-October of 2016, she did not think at that time
22   anything had happened to her?
23       A.  No, I didn't say -- she didn't think he would
24   do anything to her.  That's what I said.  She didn't
```

```
 1  think he would do anything because she was like this is
 2  somebody I see everyday, he wouldn't try to do anything
 3  to me.
 4       Q.  That's what K█████ told you when you first
 5  spoke to her?
 6       A.  Yes, sir.
 7       Q.  That's all I have, ma'am.  Thank you for your
 8  time.  Unless there's other questions by others.
 9                 MR. DONOVAN:  I have nothing else.
10                 MR. THOMPSON:  No questions from me.
11                 MR. OWSLEY:  Thank you.
12                 MR. SHAW:  Thank you.
13                 MR. DONOVAN:  Thank you, Rachelle, for
14  your patience with all this.  I'll give you a call in
15  the morning.  I don't want to keep you awake right now.
16                 THE DEPONENT:  If you have some more
17  questions, you better ask me now.
18                 MR. DONOVAN:  That's all right.
19                 MR. SHAW:  Maybe I should ask one more
20  question.  I've got one more.
21                 MR. DONOVAN:  Okay.
22                      EXAMINATION
23  BY MR. SHAW:
24       Q.  Is there anything that you believe that is
```

```
 1  important to this case that maybe we haven't asked you
 2  or that we need to know in analyzing this case or
 3  looking at this case?
 4      A.  I think -- not really that I can think of.  I
 5  just I wish it was over so my daughter could get along
 6  with her life.  I'm not saying she's not, but I think
 7  she has a hard time because of the things that happened
 8  to her.  And she's like really a closed-up person so
 9  she really don't like to communicate it, and I think
10  her having to go back and forth and talk with lawyers
11  all the time and doctors all the time is taking a toll
12  on her.
13      Q.  That's understandable.  Thank you very much.
14                    EXAMINATION
15  BY MR. DONOVAN:
16      Q.  Okay.  I have just a couple.  Just a couple
17  questions from me, Rachelle.
18      A.  Okay.
19      Q.  In the time that you -- after this event
20  happened, after the day that Jerry Swafford sexually
21  assaulted K_____ how often did you talk to K_____?
22      A.  Oh, I talk to K_____, even when I'm over here
23  I talk to Ke___l two or three times, four times a day.
24      Q.  At that time, you know, even before this
```

1   lawsuit was filed, can you talk about some of the
2   changes you observed in K████ if there were any?
3       A.   She's very moody now.  When it first happened,
4   she didn't want to talk about it because she was like
5   she didn't think anything could happen.  She didn't
6   know because she pretty much was passed out when it
7   occurred, but after he admitted, she just -- and he
8   admitted what he did, she just -- she was distraught.
9   Like she just couldn't believe that someone would do
10  something like that to her.  I mean, honestly nobody
11  will ever know actually what he actually did in that
12  room besides himself because she can't remember
13  anything, so.
14      Q.   Okay.
15      A.   And then with all the articles that was in the
16  paper and then people that were like, I guess blaming
17  her for drinking and blaming her parents for letting
18  her go to a party.  She's a teenager.  I mean, that's
19  what teenagers do.  They drink, they go to parties.
20      Q.   So you think this has had a pretty major
21  impact on her personality?
22      A.   I think it has.  She's -- yes.
23      Q.   Okay.  You still talk to K████ every day?
24      A.   Yes, sir.  Three or four times a day some

1  days.

2      Q.   Okay, and you think she's still dealing with a

3  lot of the issues that came out of this?

4      A.   I think the more she has to talk about it, like

5  whenever she had to come see the doctors and stuff, I

6  think it bothers her when she has to think about it more.

7  Like I think if she could get on with her life and not

8  have to worry about it, which in the long run she's

9  probably going to have to deal with it the rest of her

10  life because she's never going to know what actually

11  happened.  So, yes, I think it's bothering her.

12      Q.   Okay.  Thank you very much.  You can go to bed

13  now.

14      A.   Okay.  Thank you.  Have a good day.

15              (Having indicated she would like to waive

16  reading and signing of her deposition, further this

17  deponent saith not.)

18

19                    --oOo--

20

21

22

23

24

25

1  STATE OF WEST VIRGINIA,
   COUNTY OF KANAWHA, to wit;

2
           I, Angela L. Curtis, a Notary Public within and
3  for the County and State aforesaid, duly commissioned and
   qualified, do hereby certify that the foregoing deposition
4  of Rachelle Hairston was duly taken by me and before me at
   the time and place and for the purpose specified in the
5  caption hereof, the said witness having been by me first
   duly sworn.

6
           I further certify that the attached deposition
7  transcript of Rachelle Hairston meets the requirements set
   forth within Article 27, Chapter 47 of the West Virginia
8  Code to the best of my ability.

9          I do further certify that the said deposition was
   correctly taken by me in shorthand notes, and that the
10 same were accurately written out in full and reduced to
   typewriting and that the witness did not request to read
11 her transcript.

12         I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
13 parties to the action in which this deposition is taken,
   and further that I am not a relative or employee of any
14 attorney or counsel employed by the parties or financially
   interested in the action.

15
           My commission expires August 23, 2022.  Given
16 under my hand this 10th day of May 2018.

17

18                                 

19

20

21

22

23

24

25

**-**

--ooo-- 19:19

**1**

10th 20:16
15th 9:1,4,7,12 11:2,7
16th 10:9,15 13:12
1990 6:11

**2**

2004 5:23
2011 5:22
2015 7:18,21
2016 5:19 7:15,20, 24 8:6,9 9:1,4,7,12 15:21
2018 20:16
2022 20:15
23 6:4 20:15
27 20:7

**4**

45 5:10
47 20:7

**5**

5th 4:17

**7**

7th 7:15,19,24

**A**

ability 20:8
accident 7:4
accurately 20:10
action 6:15,20 20:13,14
Adkins 10:4 12:20
administration 9:9
administrator 13:7
admitted 14:2 18:7,8
aforesaid 20:3
ahead 6:21
alcohol 11:1,3,7, 13
analyzing 17:2
Angela 20:2
area 15:1
Article 20:7
articles 18:15
assaulted 10:19 17:21
associate's 5:22
associates 8:22
associating 8:18
attached 20:6
attend 6:8
attended 6:9
attorney 6:24 7:2 20:12,14
August 15:3 20:15
awake 16:15
aware 10:6

**B**

bachelor's 5:21
back 7:12,14,15 14:24 15:11,12,15 17:10
base 4:13
Battalion 6:7
bed 19:12
Belfry 9:9
birth 5:7
bit 11:7
blaming 18:16,17
board 9:9 12:18,21 13:4
bothering 19:11
bothers 19:6
bottle 11:15
bought 11:14,15
broke 11:4

**C**

call 13:11 16:14
called 4:2 13:17
Campbell 15:18
caption 20:5
car 6:16
Carolina 5:24
case 7:10 8:14 11:19,23 17:1,2,3
certify 20:3,6,9,12
Chapter 20:7
check 6:23
child 14:4
closed-up 17:8

**C (cont.)**

coach 9:19
Code 20:8
college 5:23 15:9
commission 20:15
commissioned 20:3
Commonwealth 8:15
communicate 17:9
communication 12:23,24 13:3
company 6:20,21
concerns 9:8
confidential 5:1
confused 8:1
consumed 11:1,6
contract 5:12
conversation 13:7
conversations 10:3
correct 7:11 12:22 13:2,6 15:8,19
correctly 20:9
counsel 20:12,14
counts 6:18
County 9:8 12:21 13:4,8 20:1,3
couple 12:19 17:16
cousin 11:14,15
Curtis 20:2

**D**

dad 15:14
dad's 15:17
date 5:7
daughter 8:18,21 9:1 10:12,14,17 11:1,6 12:1 17:5
daughter's 13:18
day 9:19 10:8 17:20,23 18:23,24 19:14 20:16
days 19:1
deal 19:9
dealing 19:2
degree 5:12,21,22
degrees 5:20
depends 15:3
deployed 4:15 7:11,21 15:7
deponent 16:16 19:17
deposition 7:8 19:16 20:3,6,9,13
determine 14:18
discussions 9:22
distraught 14:3 18:8
District 13:8
doctors 17:11 19:5
DONOVAN 4:24 11:8 12:5,10 16:9, 13,18,21 17:15
Dotson's 7:8
drink 11:10 18:19
drinking 18:17
drinks 11:10
duly 4:3 20:3,4,5
Durham 8:4,7

**E**

**Eastern** 14:14
15:13
**education** 5:11
9:9 12:21 13:4
**employed** 20:12,
14
**employee** 20:13
**end** 8:11
**evening** 11:2,7
**event** 17:19
**everyday** 16:2
**EXAMINATION**
4:5 12:12 16:22
17:14
**exams** 10:14
**expires** 20:15

**F**

**facts** 11:19
**family** 8:19 11:20
**father** 15:8
**February** 4:17
5:19
**felt** 14:3
**file** 6:19
**filed** 18:1
**financially** 20:14
**finishing** 14:14
**first-hand** 11:19
**Florida** 7:5
**foregoing** 20:3
**form** 11:8
**Fort** 8:4,7 15:18

**found** 14:2
**friends** 8:22
**full** 4:7 20:10
**future** 15:1

**G**

**Gannon** 9:13,21,
23
**gave** 6:17 9:20
**get along** 17:5
**give** 16:14
**good** 19:14
**graduate** 6:10
**guess** 11:6 14:4
18:16

**H**

**Hairston** 4:9,10
20:4,7
**half** 6:4
**hand** 20:16
**happen** 18:5
**happened** 15:22
17:7,20 18:3 19:11
**hard** 17:7
**hear** 10:10 11:4
**heard** 10:12 11:20
**hereof** 20:5
**high** 6:8,9 9:9
**highest** 5:11
**hold** 5:20
**home** 7:11,19 9:2
10:7 13:18,20 14:4,
8 15:3,10,11
**honestly** 18:10

**house** 15:16,17

**I**

**idea** 7:3
**impact** 18:21
**important** 17:1
**incident** 10:7
13:11 15:20
**individuals** 11:23
**information**
11:22,24
**initially** 15:20
**insurance** 6:17,
20,21
**interested** 20:14
**invited** 8:23
**issues** 9:8 19:3

**J**

**jail** 10:22
**Jerry** 9:5 17:20
**job** 6:5 14:5
**jury** 7:6

**K**

**KANAWHA** 20:1
**Kendall** 12:1
13:15,24 14:13
15:7,20 16:4 17:21,
22,23 18:2,23
**Kentucky** 8:15
14:15 15:13,17
**key** 11:23
**kill** 14:11
**knowledge** 8:17

**L**

**late** 12:14
**lawsuit** 18:1
**lawyers** 17:10
**leave** 7:16,23 8:2
**left** 7:17
**letting** 18:17
**level** 5:11
**life** 17:6 19:7,10
**located** 4:11
**long** 4:15,18 6:1,3
12:6 19:8
**lot** 5:17 19:3

**M**

**major** 6:7 18:20
**man** 14:1,11
**management**
5:13,15,16
**Mark** 9:13
**master's** 5:12,18,
19
**medical** 10:14
**meets** 20:7
**member** 13:3
**members** 11:20
**mid-october**
15:21
**Midland** 6:2
**military** 4:13 6:3,4,
6 10:1
**minute** 12:4
**mom** 10:12
**moment** 12:8

**money** 6:17
**months** 4:19 15:2
**moody** 18:3
**morning** 10:15
13:11 16:15
**mother** 13:10,17
14:3

**N**

**night** 12:14
**Notary** 20:2
**notes** 20:9
**notice** 4:3
**November** 15:4
**number** 4:21,22

**O**

**Object** 11:8
**observed** 18:2
**obtained** 11:24
**occasions** 8:21
**occur** 7:4
**occurred** 18:7
**October** 7:15,18,
19,21,24 8:6,9,12,
24 9:4,7,12 10:8,15
11:2,7 13:12
**orders** 15:4
**OWSLEY** 12:4,13
16:11
**Owsley's** 12:10

**P**

**paid** 6:21,23
**paper** 18:16

paperwork 9:20

parents 18:17

parties 18:19 20:13,14

party 8:23 18:18

pass 12:3

passed 11:11 18:6

patience 16:14

penetrated 10:20

people 18:16

Perfect 5:17

performed 10:14

period 7:10 8:13

person 17:8

personality 18:21

phone 4:23

Pike 9:8 12:21 13:4,8

place 20:4

Plaintiff 4:2

position 13:23

pretty 18:6,20

promise 12:7

Public 20:2

published 15:5

purpose 20:4

pursuant 4:2

**Q**

Qatar 4:12,13,16, 18

qualified 20:3

question 8:5 11:5 16:20

questions 12:11,

19 16:8,10,17 17:17

**R**

Rachelle 4:9 12:5 16:13 17:17 20:4,7

raped 10:12,18 13:15,19

Raymond 10:2

read 20:10

reading 19:16

reasons 14:8

receive 5:18

received 5:19

recently 15:7

record 4:7,20 5:1,7

recorded 5:2

redeploy 14:7

reduced 20:10

Reed 10:3 12:20

reflected 4:20 5:6

registering 9:15

related 20:12

relative 20:13

relevant 7:10 8:13

remain 5:1

remember 18:12

repeat 5:4

represent 12:17

request 20:10

requirements 20:7

rest 19:9

results 10:13

return 7:24

returned 7:19

room 18:12

run 19:8

**S**

saith 19:17

school 6:8,9 8:20 9:10,15 12:18 13:8 15:11,13,15

schools 12:18

Security 4:21,22

semester 14:14

sentence 14:5

September 7:17

served 7:6

set 20:7

settled 6:20

sexually 10:19 17:20

SHAW 4:6 12:3 16:12,19,23

shorthand 20:9

signing 19:16

sir 4:14 6:13,16 8:8,16,20 9:3,6,11, 14 10:5,8,16,24 11:4,21 12:16,24 13:5,9,13,16,21 14:10,17,23 15:10, 14 16:6 18:24

small 6:23

Smith 12:17

Social 4:21,22

sounds 5:17

South 5:24

spoke 16:5

spoken 9:13

Star 6:7

started 8:18 15:11

starting 15:13

state 4:7 6:2 8:14, 15 20:1,3

states 7:13,14

station 13:22

stay 15:2,3,14

stayed 15:8

staying 10:1

student 14:21

stuff 19:5

sued 6:14

suit 6:18,19

Sunday 13:12

superintendent 12:18,21

supposed 14:6

Swafford 8:18 9:2, 5 10:7 17:20

sworn 4:3 20:5

**T**

taking 17:11

talk 9:19 17:10,21, 22,23 18:1,4,23 19:4

talked 9:15 13:24 15:20

Technology 5:15, 16

teenager 18:18

teenagers 18:19

testified 4:3 6:12

things 17:7

THOMPSON

16:10

time 7:10 8:13 9:1 12:23 13:1,3 15:6, 21 16:8 17:7,11,19, 24 20:4

times 17:23 18:24

today 5:9

told 11:9 12:6 13:10,14 16:4

toll 17:11

transcript 20:7,11

true 14:17

TUI 5:22

turned 9:20

type 9:22

typewriting 20:10

**U**

understand 8:5 14:13 15:7

understandable 17:13

understanding 7:9 8:24 10:23 11:16 14:15,19 15:19

understood 13:15

University 5:15,16 14:15

**V**

Virginia 8:10,14 15:18 20:1,7

vodka 11:16

**W**

waive 19:15

**week** 7:13

**weeks** 7:9 14:6

**West** 8:10,14 15:18
  20:1,7

**Williamson** 6:9

**wit** 20:1

**worked** 6:24

**worry** 19:8

**wreck** 6:16

**written** 20:10

---

### Y

---

**year** 6:10 7:22

**years** 5:10 6:4

**York** 8:5,7

**Yvette** 4:9