IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF KENTUCKY


K.D.,

        Plaintiff,

v.                          Civil Action No. 7:17-cv-132-KKC


JERRY SWAFFORD, in his individual capacity;
THE PIKE COUNTY BOARD OF EDUCATION,
REED ADKINS, in his individual capacity; and
MARK GANNON, in his individual capacity.

        Defendants.




        The deposition of NEE JACKSON, taken upon oral

examination, pursuant to notice and pursuant to the

Federal Rules of Civil Procedure, before Kimberly

Wooten, Court Reporter and Notary Public in and for the

State of Kentucky, Wednesday, May 16, 2018, at Pike

County Board of Education, 316 Mayo Trail, Pikeville,

Kentucky.




                    REALTIME REPORTERS
                      713 Lee Street
                   Charleston, WV  25301
                     (304)344-8463
                   www.realtimereporters.net

APPEARANCES

On behalf of K.D.:

    Ryan McCune Donovan, Esquire
    William Flynn, Legal Assistant
    Bailey & Glasser, LLP
    209 Capitol Street
    Charleston, WV  25301
    (304) 345-6555
    rdonovan@baileyglasser.com

On behalf of Pike County Board of Education:

    Neal Smith, Esquire
    General Counsel, Pike County Board of Education
    316 South Mayo Trail
    Pikeville, KY  41501
    (606) 433-9208
    neal.smith@pike.kyschools.us

    Michael A. Owsley, Esquire
    English, Lucas, Priest & Owsley, LLP
    1101 College Street
    Bowling Green, KY  42102
    (270) 781-6500
    mowsley@elpolaw.com

On behalf of Mark Gannon and Reed Adkins:

    Jonathan C. Shaw, Esquire
    Porter, Banks, Baldwin & Shaw, PLLC
    327 Main Street
    Paintsville, KY  41240
    606) 789-3747
    jshaw@psbb-law.com

On behalf of Jerry Swafford:

    Mark K. Thompson, Esquire
    Smith Thompson & Kennedy, PLLC
    140 Scott Avenue
    Pikeville, KY  41501
    (606) 432-2156
    maxthompson@setel.com

EXAMINATION INDEX

NEE JACKSON

Examination by Mr. Donovan                              Page 4

= NO EXHIBITS =

P R O C E E D I N G S

NEE JACKSON

3    was called as a witness by the Plaintiff, pursuant to

4    notice, and having first been duly sworn, testified as

5    follows:

6                        EXAMINATION

7    BY MR. DONOVAN:

8        Q.   Mr. Jackson, thank you for being here today.

9    I understand that unlike the rest of us, you have

10   another job?

11       A.   Oh, yes, sir.  Well, I've got more than one,

12   but, yeah.

13       Q.   I appreciate you taking your time out to be

14   here and I'll do my very best to go quickly.

15            My name is Ryan Donovan, and I represent

16   K█████ D█████, who was a student at Belfry High School

17   and was is the plaintiff in this case.

18            I think you may have done this in advance, but

19   could you spell your full name for the record?

20       A.   R-E-X-E-L, N-E-E, J-A-C-K-S-O-N, the 2nd.

21       Q.   Okay.  And you prefer Nee?

22       A.   Nee, yes, sir.

23       Q.   I'll go with Mr. Jackson.

24       A.   Nee is fine.

```
 1      Q.   And not to be reflected on the record, what is
 2   your physical address?
 3      A.   ████████████████████████████████████████
 4   ████████
 5      Q.   Okay.  And also not to be reflected on the
 6   record, what is your birth date and Social Security
 7   number?
 8      A.   ████████.  ████████████.
 9      Q.   Thank you.  Mr. Jackson, have you ever given a
10   deposition before?
11      A.   Yes.
12      Q.   Okay.  When did you do that?
13      A.   2011, somewhere thereabouts.  No, I'm sorry,
14   it was about 2005.
15      Q.   What kind of a case was that?
16      A.   It was a case, a company I worked for,
17   involved in a vehicle accident.
18      Q.   Were you a party to this case or just a
19   witness?
20      A.   I was involved in the accident.
21      Q.   Were you the plaintiff in that case?
22      A.   No, the defendant.
23      Q.   Okay.  Have you ever given any other
24   depositions?
```

1      A.   No, sir.

2      Q.   Have you ever been involved in any other

3  lawsuits?

4      A.   No, sir.

5      Q.   Not to say you're directly involved in this

6  lawsuit, understand that you're here today just in your

7  capacity as a member of the Board.

8          If you did that deposition, I know it was

9  awhile ago, so I'll just remind you basically how it

10  works.  This is our opportunity for us to ask you some

11  questions about the case.  You understand that you're

12  under oath, correct?

13     A.   Yes, sir.

14     Q.   That means you have to be truthful, just like

15  if you were in a courtroom with a judge and a jury and

16  the whole nine yards, right?

17     A.   Yes, sir.

18     Q.   From the -- are you represented by counsel

19  here today?

20     A.   Mr. Smith and Mr. Owsley.

21     Q.   Okay.  And they are your counsel in their

22  capacity as counsel for the Board of Education, correct?

23     A.   Yes, sir.

24     Q.   Do you have personal counsel in connection

1  with this matter?

2      A.   No, sir.

3      Q.   Okay.  So these are your only attorneys?

4      A.   Yes, sir.

5      Q.   Okay.  From time to time, Mr. Smith may

6  interpose an objection in response to a question that I

7  ask.  In most instances if he does so, you can go ahead

8  and answer the question.  The only exception to that

9  would be if I ask a question that in some way impinges

10 on the attorney-client privilege.  It wouldn't be my

11 intention to do that, but I might do it accidentally.

12 And in that case, Mr. Smith will let you know and he'll

13 tell you not to answer the question.

14          Does that sound fair?

15     A.   Yes, sir.

16     Q.   The only other thing is, if you need a

17 break -- I don't think we're going to be here very long

18 today -- but if for some reason you need a break at any

19 time, just say so, take one as long as you need.  The

20 only thing I would ask is, if I've asked you a question,

21 if you could finish your answer to that before we take a

22 break.  Fair?

23     A.   Yes, sir.

24     Q.   Okay.  Great.  Mr. Jackson, am I correct that

1  you're a member of the Board of Education?

2      A.    Yes, sir.

3      Q.    Okay.  How long have you been on the Board?

4      A.    This is my first Board.

5      Q.    Okay.  How long is your term?

6      A.    Election is again in the fall of this year.

7      Q.    So this is your first term on the board?

8      A.    Yes, sir.

9      Q.    All right.  Will you be running again?

10     A.    Yes, sir.

11     Q.    Okay.  Are Board seats in Pike County

12  allocated by district, are you a representative -- what

13  I'm asking is:  Are you a member from a particular

14  district, or are the members of the Board elected from

15  the county at large?

16     A.    The particular district, District 4.

17     Q.    Okay.  What part of the county is District 4?

18     A.    It's the Belfry area.  It's feeder schools.

19     Q.    Do you have particular responsibility to that

20  district, or once you're elected, you know, your

21  responsibilities are the entire district?

22     A.    Yes, the entire district.

23     Q.    Okay.  Have you ever run for any other

24  political office?

1    A.    No, sir.

2    Q.    Okay.  Is Board of Education in Pike County a

3  partisan election?

4    A.    It's nonpartisan, sir.

5    Q.    I understand you have at least one other job,

6  maybe more?

7    A.    Yes, sir.

8    Q.    Okay.  What other jobs do you have right now?

9    A.    Volunteer fire chief, trustee at the church

10  that I attend, coach soccer, have coached baseball and

11  football, serve on some 911 advisory board for the

12  county.

13    Q.    Where did you coach football and soccer?

14    A.    At Belfry for the youth leagues.

15    Q.    For Belfry High School, or just --

16    A.    Just in the Belfry area.

17    Q.    Okay.  Have you ever been -- well, let me ask

18  you this:  As a Board member, are you considered an

19  employee of the Board of Education?

20    A.    No, sir, I don't think we're considered

21  employee.

22    Q.    Have you ever been an employee of the Board of

23  Education?

24    A.    No, sir.

1    Q.   Okay.  Is anyone in your family a member -- an

2    employee of the Board of Education?

3    A.   No, sir.

4    Q.   Okay.  Any teachers in your family?

5    A.   I have a sister.

6    Q.   Where does she teach?

7    A.   Mingo County.

8    Q.   Okay.  What school?

9    A.   She teaches at Birch.

10   Q.   Okay.  How long has she been there?

11   A.   Honestly, I have no idea.

12   Q.   That's fine.

13   A.   I can't remember.

14   Q.   Sure.  Are you married?

15   A.   Yes, sir.

16   Q.   Okay.  And what is your wife's name?

17   A.   Kimberly.

18   Q.   Do you have any kids?

19   A.   Two.

20   Q.   Boys or girls?

21   A.   Girls.

22   Q.   And what are their ages?

23   A.   20 and 14.

24   Q.   Okay.  And where do they attend school

1   currently?

2       A.   Eastern Kentucky University and Belfry Middle

3   School.

4       Q.   Okay.  Did the older girl attend Belfry High

5   School?

6       A.   Yes, sir.

7       Q.   Okay.  And what year did to she graduate?

8       A.   Three years ago, sir.

9       Q.   Okay.  Prior to the jobs you described, did

10  you hold any other employment?

11      A.   I've worked for mining companies, worked for a

12  fire suppression company, managed a McDonalds for 10

13  years as a restaurant manager.

14      Q.   Was that the McDonalds up at South Williamson?

15      A.   That was one of them.

16      Q.   Okay.

17      A.   It's been about 15 years ago since I worked

18  there.

19      Q.   Okay.  Have you been involved in any other

20  political campaigns not your own?

21      A.   No, sir.

22      Q.   What is your highest level of education?

23      A.   I have an associate's degree in business.

24      Q.   And where did you get that?

 1      A.    Southern West Virginia Community College.

 2      Q.    That's over in Williamson, right?

 3      A.    Yes, sir.

 4      Q.    And where did you go to high school?

 5      A.    Belfry High School.

 6      Q.    Okay.  Who was the principal when you were in

 7  Belfry High School?

 8      A.    Frank Welch.

 9      Q.    Okay.  And what year did you graduate?

10      A.    1986.

11      Q.    Mr. Jackson, when did you decide to run for

12  the Board of Education?

13      A.    June or July -- June three years ago.

14      Q.    Okay.  Is that about the time -- is that

15  before or after your older daughter had graduated?

16      A.    Oh, it was before.

17      Q.    And why did you decide to run for the Board of

18  Education?

19      A.    Because I wanted to better help the children

20  in my area and in Pike County.

21      Q.    Were there particular issues that you were

22  concerned with?

23      A.    No, sir.

24      Q.    How would you describe your duties on the

1  Board of Education?

2      A.   We're in charge of the financial dealings of

3  the School Board as a whole.

4      Q.   Is it limited to finance, or do you have other

5  duties, as well?

6      A.   The only other duties we have are, say, you

7  know, graduations, things like that, you know, things we

8  have to attend to maybe give out awards or something

9  like that.  But other than that, our primarily

10 responsibility is the financial matters of the Board.

11     Q.   Do you set policy for the Board?

12     A.   We don't set policy.  We approve policies if

13 they're presented to the Board.

14     Q.   Who presents those to the Board?

15     A.   Most of the time, the superintendent.

16     Q.   But you do have the final say on policies --

17 the Board as a whole, not you personally?

18     A.   Yes, we vote on those.

19     Q.   Okay.  And would that include personnel

20 policies?

21     A.   We don't deal with personnel, sir.

22     Q.   Okay.  Who does that?

23     A.   That's the superintendent and the personnel

24 director.

1      Q.    And you have no -- the Board has no

2   supervisory authority over that at all?

3      A.    No, we don't have any dealings with personnel.

4      Q.    Okay.  How about training of faculty or staff

5   in your schools?

6      A.    We don't, we're -- the everyday workings are

7   up to, at a school, it will be the principal.  The Board

8   as whole, would be the superintendent.  And, you know,

9   you have a chain of command.

10      Q.    Sure.

11      A.    And we don't, we're not able to -- we're not

12   here to second-guess or micromanage any of that.  We,

13   you know, that's their job.  Superintendent's job is to

14   oversee everyday business of the district, and the

15   different principals are over their, you know, their

16   prospective schools.

17      Q.    These aren't trick questions.

18      A.    Right.

19      Q.    I'm just trying to understand how the power is

20   divided.

21      A.    Right.

22      Q.    Tomorrow I'm going to be talking to

23   Mr. Adkins.  I'm trying to get a sense of what he does

24   and what you do.

1      A.    Yes.

2      Q.    Do you guys hire and fire the superintendent?

3      A.    Yes.

4      Q.    Okay.  Do you hire and fire counsel for the

5  Board of Education?

6      A.    Yes.

7      Q.    Okay.  Mr. Smith?

8      A.    Yes.

9      Q.    Okay.  So those would be -- there are some

10  personnel decisions that you guys have a role in?

11     A.    Those two, that's our only.

12     Q.    Okay.  Nothing else, not assistant

13  superintendents?  Certainly not janitors, right?

14     A.    No, sir.

15     Q.    Okay.  Do you serve on -- do you have any

16  particular role on the Board; for example, do you chair

17  a subcommittee on any particular policy or issue,

18  anything like that?

19     A.    No, sir.

20     Q.    Okay.  Mr. Jackson, in very general terms,

21  what do you know about this case?

22     A.    Basically, I was, I was contacted by

23  Ms. Anderson on or about a Friday evening -- and I don't

24  have the dates in front of me, so I don't know the exact

1  date -- and she had mentioned to me that there was
 2  supposed to be a party that was going to happen over the
 3  weekend.
 4         And when she mentioned it to me, I told her at
 5  that time, I told her that that was a personnel issue,
 6  that I was prohibited from dealing anything with
 7  personnel.  I asked her if she had contacted the West
 8  Virginia Police, because Mr. Swafford lived in West
 9  Virginia.  She told me she had.
10         And then I, in turn, told her that she needed
11  to get in contact with Mr. Gannon because that was
12  Mr. Swafford's direct supervisor.
13     Q.  Okay.  You got kind of ahead of me a little
14  bit there, so I might want to go back just a little bit
15  from some of that.  But I appreciate that, that was a
16  direct answer.
17         Do you know who K██████ D██████is?
18     A.  No, sir.
19     Q.  Okay.  Do you know that she was a student at
20  Pike County Schools?
21     A.  No, sir.
22     Q.  Okay.  Do you know that she was a plaintiff in
23  this case?
24     A.  Not until.

1    Q.   Okay.  That's fine.  No reason for you to

2  know, just want you to understand where we are.

3    A.   Right.

4    Q.   Do you understand what the Plaintiff's claims

5  in this case are basically, in any way?

6    A.   No, sir.

7    Q.   Okay.  That's fine.

8         How do you know Cindy Anderson?

9    A.   I've known her all of her life.

10   Q.   Okay.  Is she younger than you or older than

11  you?

12   A.   Younger.

13   Q.   Okay.  Did you know her -- so you must have

14  known her before you were on the Board of Education?

15   A.   I helped her on the school bus the first day

16  she left, left the ground to put her feet on the school

17  bus, crying out of her mom's arms.

18   Q.   Were you a neighbor?

19   A.   She lived right in the same hollow where I was

20  raised.  I was the bus monitor that had to take her from

21  her mom.

22   Q.   Sounds like that could have been a stressful

23  job?

24   A.   I just happened to live lower, further down on

1   the hollow, and she lived closer to the end.  So it was

2   one of those things where I guess I was in the wrong

3   place at the wrong time for that little girl, because

4   she didn't like it too well.

5       Q.   Where was she going to school?

6       A.   Varney Elementary.

7       Q.   Okay.  So if you had to -- and I know you

8   don't have dates, I'm not asking for a precise date --

9   but if you had to ballpark it, how long you've known

10  her, 20 years?  30 years?

11      A.   40.  Honestly, I don't know how old she is, I

12  know it's been over 40 years.

13      Q.   Okay.  Do you think that Cindy Anderson is

14  generally a truthful person?

15      A.   To my knowledge.

16      Q.   Are you aware of her ever having been

17  untruthful to you or anyone else?

18      A.   Not to my knowledge.

19      Q.   Okay.  So go back to that call, and then we

20  won't be here very long, from my standpoint.  You said

21  you didn't have the times and dates in front of you.

22  There have been some other depositions in this case, so

23  and we've -- the parties have all sort of exchanged some

24  documents.  You wouldn't have seen any of that, since

```
 1  you're not personally a party, but I want to go through
 2  some of those and confirm that, your understanding and
 3  everything, correct?
 4       A.   Okay.
 5       Q.   Is your phone number ██████████?
 6       A.   Yes, sir.
 7       Q.   Okay.  And are you -- you have a Facebook
 8  page?
 9       A.   Yes, sir.
10       Q.   Are you friends with Cindy Anderson, as far as
11  you know?
12       A.   Yes, sir.
13       Q.   Okay.  Probably friends with a lot of people
14  as a politician, right?
15       A.   Yes, sir.
16       Q.   Is it common for -- is one of your jobs, do
17  you view one of your jobs as a Board member to interact
18  with the public when they have questions and concerns?
19       A.   As best I can, yes, sir.
20       Q.   So it's common for people to reach out to you
21  through your Facebook page?
22       A.   Somewhat, yes, sir.
23       Q.   And do you share your number with people
24  freely so they can call you if they need to?
```

1    A.    Unfortunately.

2    Q.    Between that and the fire job, you probably

3 don't get much peace?

4    A.    No, there's not too many people that don't

5 have my number.

6    Q.    Okay.  Would it sound about right to say that

7 you had talked to Cindy Anderson around 4:00 o'clock on

8 October 14, 2016?

9    A.    Yes, sir, I would -- I think that's probably

10 about -- would that be on a Friday?

11    Q.    Yes, sir.

12    A.    Okay.  Yes, sir.

13    Q.    Okay.  And her records indicate that you spoke

14 for about 14 minutes.  Does that sound accurate to you?

15    A.    Probably so, sir.

16    Q.    Okay.  So you testified earlier that you

17 remember a few things about that call?

18    A.    Yes, sir.

19    Q.    You testified that she told you she believed

20 there was going to be a party at Jerry Swafford's house,

21 right?

22    A.    Yes, sir.

23    Q.    Okay.  And you testified that she told you

24 that she was concerned about the party, right?

1        A.    Yes, sir.

2        Q.    And she was concerned because she was aware

3    that Mr. Swafford had given her daughter and some other

4    minors alcohol and drugs in the past; is that accurate?

5        A.    I don't recall that, sir.

6        Q.    Okay.  Did she tell you why she was concerned

7    about the party?

8        A.    She just told me that she thought there was

9    going to be a party there, and that there might be young

10   people there.

11       Q.    Okay.  But she seemed -- you talked for 14

12   minutes, right?

13       A.    Yes, sir.  Like I say, I've known her all of

14   her life, we did a lot of catching up.  I don't talk to

15   her frequently, so there was a lot of chit-chat, you

16   know, just catching up.  Like I say, she was raised on

17   the hollow -- she doesn't live there now -- but we was

18   raised on the same hollow, so I've known her all of her

19   life.

20       Q.    But did she seem upset when she talked to you

21   about this?

22       A.    Not necessarily, sir.

23       Q.    Well, what do you recall about her affect

24   during that call?

1     A.   I, you know, I didn't -- I didn't notice

2  anything or recognize anything different from, you know,

3  if I met her, if I saw her on the street or any other

4  place, I mean.

5     Q.   And did she tell you she had called Principal

6  Gannon already?

7     A.   No, sir.

8     Q.   Okay.  Did she say anything about having

9  called the police?

10    A.   Yes, sir.

11    Q.   Okay.  And why did she say she called the

12  police?

13    A.   Because there was going to be a party,

14  supposedly the next evening.

15    Q.   Okay.  And, I mean, you must have figured that

16  if she called the police, she wasn't talking about a

17  birthday party with cake and ice cream, right?

18    A.   Right.

19    Q.   Okay.  So you must have assumed that she

20  thought there was something happening at that party that

21  would warrant calling the police?

22    A.   Yes.

23    Q.   Okay.

24    A.   That's when, you know, and like I mentioned

1 earlier, I informed her -- I asked her if she had called

2 the police, and she said yes. So and that's when I

3 informed her to tell, you know, call Mr. Gannon, as

4 well.

5     Q. So it was your impression that she thought the

6 party might be dangerous to the students somehow that

7 were there?

8     A. I don't think danger ever came up, more that

9 she felt like it was inappropriate.

10     Q. Okay. She thought there were things that were

11 going to happen at that party that were inappropriate

12 for -- to be happening between a grown man and young

13 women?

14     A. Yeah, I took -- I took it, she felt like it

15 was going to be something possibly inappropriate could

16 be there.

17     Q. Right. And, of course, she discussed the fact

18 that Jerry Swafford was an employee of the School Board,

19 right?

20     A. Well, she mentioned it when she mentioned his

21 name.

22     Q. Okay. And you correct me if I'm wrong,

23 because I'm trying to remember what you said: You told

24 her to call the police; is that right?

1    A.    Yes, sir.

2    Q.    Okay.  And you told her to do what else?

3    A.    Contact Mr. Gannon, because that was his

4  direct supervisor.

5    Q.    Okay.

6    A.    And that I was prohibited to deal with any

7  personnel issues, and, you know, that I -- further than

8  that, I didn't have any.

9    Q.    Why did you ask her to contact Mr. Gannon?

10   A.    Because that's his direct supervisor.

11   Q.    Okay.  Did you expect that Mr. Gannon would do

12  something about it?

13   A.    I didn't know.  You know, that's his direct

14  supervisor, and that's the reason I directed her to call

15  him, because it's a personnel issue, so.

16   Q.    And why exactly did you think it was a

17  personnel issue?

18   A.    Because she called me because he was an

19  employee of the school.

20   Q.    But when you say you're not allowed to be

21  involved in personnel issues, you don't mean you can't

22  be involved in anything that has to do with a person who

23  works at the school, you generally mean you can't be

24  involved in hiring and firing, right?

1    A.    We're not involved -- we're not able to be

2  involved in any personnel issues.

3    Q.    What is a -- what I'm trying to get at, and

4  I'm just trying to understand the scope of, because I

5  think you were just doing what you had to do -- what is

6  a personnel issue; in your mind, what does that mean?

7    A.    Whether it's reprimanding for something

8  somebody did wrong, reporting something that somebody

9  may have said done.  Anything within the scope of

10  possibly their job, you know, anything -- anything of

11  that nature, in my opinion, deals with personnel.

12    Q.    So it was your understanding that if the issue

13  was that there was an employee who might pose a threat

14  to a student, or might be doing something inappropriate

15  with a student, that that was something you were

16  prohibited from getting involved in?

17    A.    From a School Board member, that's -- that's

18  my training, is that, you know, we're not involved in

19  any personnel issues.

20          And aside of that, like I say, I mentioned to

21  her, and she had already told me that she had contacted

22  the West Virginia Police.  So, you know, on my behalf, I

23  felt like I was -- I had done everything that I was able

24  to do.

1    Q.   Right.  But you did believe that it was

2  appropriate for Mr. Gannon to be the one to handle that

3  as opposed to you as a member of the Board of Education?

4    A.   Yes, sir.

5    Q.   As a member of the Board, do you have any idea

6  what the standards are for when a School Board employee

7  is required to investigate or report or look into a

8  threat to student safety?

9    A.   No, sir.

10    Q.   Okay.  As a parent also of students who have

11  been under Board, what kinds of reports would you expect

12  a school employee to respond to?

13    A.   Can you give me a little more specific or

14  clarify that?

15    Q.   Sure.  Sure, that's a very vague question, I

16  apologize.

17         As a parent, if a school administrator like a

18  principal were told that something potentially dangerous

19  were to occur, would you want that administrator to take

20  action to stop it from occurring?

21    A.   I would definitely want them to investigate it

22  and, you know.

23    Q.   You would want them to do something?

24    A.   You know, I -- they definitely need to be

1  investigated, you know, in a timely manner.

2      Q.   And in your mind, for something to be timely,

3  it would have to be before the threat occurred, right?

4  For example, if you knew something dangerous were going

5  to happen -- and not you -- if an administrator knew

6  something dangerous were going to happen on the 10th of

7  November, it wouldn't be timely to investigate it on the

8  12th of November, would it?

9      A.   No, sir.

10     Q.   Okay.  And do you think that it's necessary

11  for an administrator to have some kind of tangible

12  proof, like a photograph or a video, to even investigate

13  an allegation?

14          MR. SMITH:  Objection.  I don't know that Nee

15  has sort of qualified himself to be the judge of that.

16  I don't know that he has the knowledge --

17          MR. DONOVAN:  Sure.

18          MR. SMITH:  -- to opine on that, but I

19  understand --

20          MR. DONOVAN:  It won't be admissible then, but

21  I'm just curious as to his opinion.

22          THE WITNESS:  I probably couldn't weigh either

23  way, I don't know.

24  BY MR. DONOVAN:

1    Q.   Well, let me put it this way:  If you were a

2  parent, and you went to the principal and you said, "I

3  think" -- or, "I know there is a party happening the

4  next night, and I know that the person throwing the

5  party has provided alcohol to underage people in the

6  past;" would you expect the administrator to

7  investigate, or would you expect him to wait until he

8  had seen pictures or photos or videos or some other kind

9  of evidence?

10   A.   I would probably want -- I would probably want

11  something, some kind of evidence, some way to

12  corroborate the story.

13   Q.   Eventually, right?

14   A.   Because, you know, anybody can say anything.

15  Hearsay, anybody can say anything, you know, to or about

16  anyone, you know, for you to be able to quantity whether

17  something is right or wrong.  Just because you tell me

18  something, that doesn't necessarily mean that --

19   Q.   Absolutely.  I totally agree with you, you

20  need more than just allegations before somebody would be

21  punished or suspended or disciplined or anything like

22  that.

23       But what I'm asking about is different that

24  that.  What I'm asking about is:  How much information

1  do you think they need just to look into it further?  Do

2  you think they should have to have pictures -- do you

3  think that an administrator needs to see pictures before

4  even investigating something?

5          MR. SMITH:  Objection, I believe he just

6  answered that question.

7          MR. DONOVAN:  No, he answered -- I think he

8  misunderstood my question to ask what was necessary, you

9  know, to prove someone's guilt.  But I want to clarify,

10  that's not what I'm asking.

11         MR. SMITH:  I believe he indicated, he would

12  need some evidence to corroborate or sustain the

13  allegation being made in the preliminary report.

14         MR. DONOVAN:  Right, and that wasn't an answer

15  to my question.

16  BY MR. DONOVAN:

17     Q.   My question was:  What kind of -- would be

18  necessary to investigate, to look into it further?

19     A.   More than just somebody's word.

20     Q.   All right.  Can we take a three-minute break?

21         MR. SMITH:  Sure.

22         (Brief off the record.)

23  BY MR. DONOVAN:

24     Q.   Again, Mr. Jackson, I appreciate you being

1  here today.

2        In addition to anything we've discussed today,

3  are you aware, personally aware of any other facts that,

4  as far as you know, are related to any claims or

5  defenses in this case?

6     A.    No, sir.

7     Q.    Pass the witness.

8        MR. SMITH:  No questions.

9        MR. THOMPSON:  No questions.

10        MR. SHAW:  I don't have any questions.

11        MR. DONOVAN:  Thank you, Mr. Jackson.

12        (Deposition concluded at 3:23 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

CERTIFICATE OF COURT REPORTER:


I, Kimberly Wooten, a Notary Public and Professional Reporter within the State of Kentucky, duly commissioned and qualified, do hereby certify that the foregoing deposition was duly taken by me, the said witness having been by me first duly sworn.

I do further certify that said proceedings were correctly taken by me in stenotype notes, that the same were accurately transcribed out in full and true record of the testimony given by said witness to the best of my ability.

I further certify that I am neither counsel for, nor related to or employed by, any of the parties hereto or financially interested in the action.


Given under my hand this 25th day of May, 2018.



*Kimberly Wooten*
_____
Kimberly Wooten
Professional Reporter/Notary Public

My commission expires: July 20, 2020

